[No. 24471. Department One. August 3, 1933.]

THE SAMUEL AND JESSIE KENNEY PRESBYTERIAN HOME et al., *Respondents*, v. THE STATE OF WASHINGTON, *Respondent*, JOSIAH THOMAS *et al.*, *Appellants*.[1]

[1] Reported in 24 P. (2d) 403.

20

*Murphy & Kumm,* for appellants.

*S. D. Wingate* and *John F. Reed,* for respondent Presbyterian Home et al.

*Roberts, Skeel & Holman,* for respondent Henry H. Judson.

*J. Forbes McBurney, J. H. Pocock, W. R. Sibley, Peter B. MacLean, W. A. Brown, Walter A. McClure, Wm. Hickman Moore,* and *McClure & McClure, amici curiae.*

MILLARD, J.—Samuel and Jessie Kenney, husband and wife, were members of the First Presbyterian Church of the city of Seattle, in which city they resided from 1865 until the death of the husband in 1896 and the death of the wife in 1900. Mr. and Mrs. Kenney hoped and planned to establish a home for aged people. Samuel Kenney left his property to his wife with the request that it be used for that purpose. In her will, which was probated and her estate administered in the superior court for King county, Mrs. Kenney provided for the organization of a corporation (The Samuel and Jessie Kenney Presbyterian Home) and the appointment of five of her "dear friends" (Frederick H. Whitworth, Roland H. Denny, Alexander Myers, Eben S. Osborne and William R. Ballard) as trustees to effectuate the Kenneys' charitable plan of establishing a home for aged people. The first three above-named qualified, and are still acting as trustees. Mr. Osborne qualified and acted as a trustee until his death in 1922. His successor, W. B. Shoemaker, served until his death in 1926, and was succeeded by Henry H. Judson, one of the trustees at the present time. Mr. Ballard died in 1929, and was succeeded by N. P.

Myhre, the fifth member of the present board of trustees.

The pertinent provisions of Mrs. Kenney's will read as follows:

"ITEM FIVE: I direct my executors, trustees, or their successors, or the corporation hereinafter provided for, to make the money payments in this will specified to be made, as hereinafter provided, to the respective legatees hereinafter appointed; and I charge my estate in the hands of my executors, trustees or their successors, or in the possession of said corporation, with such money payments, and the same are to be discharged and paid out of my estate, and the residue of my estate after such payments, shall be for the use and benefit of the home or retreat for infirm persons hereinafter mentioned. I direct that none of my real estate be sold to pay the legacies in this will provided for, but that such legacies be paid out of my personal property and money belonging to me at the time of my death, or out of the rents, issues and profits of my real estate, and I direct that first in order of payment by my executors, trustees or their successors, or the corporation hereinafter provided for, shall be the monthly payments to John Kenney, Mary Ann Kenney and Robert Allan, and the annuity to Margaret Kenney, and after that the other legacies, and none of the legacies in this will provided for shall bear interest.

"ITEM SIX: I give, devise and bequeath all the rest and residue of my estate, of every kind and nature whatsoever and wheresoever situated, to my dear friends, Frederick H. Whitworth, Rolland H. Denny, Eben S. Osborne, William R. Ballard and Alexander Myers, of the city of Seattle, county of King, and state of Washington, to have and to hold the same unto them and their successors forever, in trust, nevertheless, under the trusts, and with the powers hereinafter defined, that is to say:

"1st. Except as hereinafter otherwise limited they shall take, receive, collect, hold, manage, invest, reinvest, dispose of, convey, deed, and accumulate, the same and the rents, issues, profits and increase thereof as they and their successors shall deem for the best

interests of the trusts in this item created and defined, and as soon as practicable after my decease, shall found and thenceforth forever maintain therewith or with the same and other donations and accessions and accumulations in aid thereof, in the city of Seattle, and state of Washington, or in the vicinity of said city, a home or retreat for such infirm persons of both sexes of above sixty (60) years of age, as they or their successors in such trust shall from time to time approve and appoint, who by reason of poverty are, in the judgment of said trustees or their successors, unable to adequately provide for themselves, and where such persons, irrespective of their religious or political views, shall be gratuitously supplied as far as may reasonably be, with the shelter, care and comforts of a home, which home or retreat shall be called and known as The Samuel and Jessie Kenney Presbyterian Home and shall be subject to such reasonable rules and regulations for the conduct and government thereof as said trustees and their successors shall from time to time prescribe. Notwithstanding the limitation that infirm persons in this paragraph mentioned to be admitted to said Home shall be above the age of sixty years, said trustees or their successors in said trust, may in their discretion in extreme and meritorious cases admit to said Home, subject to the conditions herein provided for, infirm persons under the age of sixty years. I would also suggest to my said executors or trustees or said corporation, that in the first instance, at least, small cottages of two or three rooms could be built upon the proposed tract, and thus at a small cost provide homes for husbands and wives or others.

"2nd. My will is that each of the persons above named as original trustees, who shall consent to act as such, shall before he shall act as such trustee, file in the office of the auditor or recorder of the county in which the city of Seattle shall then be, and within twelve months after the date of my decease, his written consent signed by him.

"3rd. It is my will and I hereby nominate and appoint the Session of the First Presbyterian Church of Seattle and their successors in office as members of

such session who shall constitute a board to fill all vacancies in said Board of Trustees or in the Board of Trustees or Directors of said corporation and if any of the said trustees named in the first paragraph of this item, six, shall not survive me, or shall not consent to act, then I direct the said session of the First Presbyterian Church to fill up the number of the said trustees to five (5) and it is my will that there shall never be more than five (5) trustees, either as trustees of this my will, or as trustees or directors of the said corporation, to execute said trusts, and that if ever such trustees shall fall or be below five (5) in number it shall be the power and the duty of the said Session of the First Presbyterian Church of Seattle to elect another or others to fill said number up to five (5) and to evidence such election by their duly executed and acknowledged deed granting to the person so elected the office of such trustee or director. But no one shall be eligible for such election who is not a member in good and regular standing of some Protestant, Evangelical church, and at the same time a resident of the city of Seattle, or of the county in which said city for the time being shall be. Every person who shall become trustees except those named in this will, shall, before acting as or becoming trustee, file for record in the office of the auditor or recorder of said county, the deed granting to him said office, and take an oath and enter into a bond in the sum of five hundred dollars ($500) penalty, and with two or more sureties, subject to the approval of the Session of the First Presbyterian Church, and payable to the said Session of the First Presbyterian Church for the benefit of the said Home, and shall file and record the said oath and bond in the office of the auditor of said county, and shall file a copy of such oath and bond with the said Session of the First Presbyterian Church of Seattle, faithfully to discharge the duties of such trustee.

"4th. In case any trustee ceases to be a resident of the county in which the city of Seattle shall for the time being be, or continues to be absent from said county for more than six months, or ceases to be a member in good and regular standing in some Protes-

tant, Evangelical church, the other trustees may by their duly acknowledged deed in duplicate one of which shall be recorded in the office of the auditor or recorder of such county, and the other filed with the clerk of the Session of the said First Presbyterian Church, revoke his powers and declare him to be no longer a trustee, and he shall thereupon cease to be a trustee. Or in case of like absence or for any good cause shown the said Session of the First Presbyterian Church may remove any one or more trustees from his or their trust and another or others, qualified as herein provided, select and appoint as aforesaid in place of the trustee or trustees so removed, and in each case both the deed of removal and of appointment shall be filed and recorded in the office of the auditor or recorder of such county.

"5th. A majority of those who are for the time being trustees may transact any and all business relating to the trust, and any trustee may by his duly executed letter of attorney, duly recorded in the office of the auditor or recorder of said county, authorize and empower any of his co-trustees to act for him during his own absence from the state of Washington, provided such absence is less than six months.

"6th. It is my will that the succession of trustees in the trusts hereby created, shall never fail and that the said Session of the said First Presbyterian Church shall be free and have power to exercise at any and all times, any and sufficient jurisdiction to provide for and secure such succession and the faithful carrying into effect of all and singular the trusts in this will created or defined.

"7th. It is my will that within a reasonable time after my death my trustees or their successors shall form or cause to be formed under the laws of the state of Washington, a corporation, under the name of "THE SAMUEL AND JESSIE KENNEY PRESBYTERIAN HOME," having perpetual succession and with powers proper to receive and maintain such home, and to promote and execute the trusts in this item created, and to receive, manage, and apply in harmony therewith, or in aid thereof, any new or additional benefactions, in which corporation no one shall be eligible to the office

of trustee or director, unless he shall be a member in good and regular standing of some Protestant, Evangelical church, and a resident of the city of Seattle, or of the county in which the city of Seattle shall then be. Each trustee or director of such corporation shall, before any of my estate or any of the aforementioned trusts are turned over to it, give bond as is hereinbefore provided in the case of a person becoming a trustee, and each person afterwards becoming trustee or director of such corporation shall, before acting as or becoming such, enter into like bond, every bond so given to be filed and recorded as hereinbefore provided for the bond of a trustee. And when such corporation shall have been so organized and be competent to do business, said trustee or their successors shall turn over to said corporation all of my estate and all of the trusts in this item mentioned, and said corporation and its successors shall thereupon become and be to all intents and purposes their successors in said trusts.

"8th. The principal place of business of my said trustees and their successors, and said corporation, shall at all times be in the city of Seattle, King county, Washington.

"9th. My said trustees and their successors and said corporation shall cause to be kept on file in an orderly manner, all papers relating to the business and transactions within or pursuant to said trusts, and shall cause to be kept in suitable books full and detailed record of all their proceedings and transactions, and clear, accurate, full and detailed accounts of all the properties and dealings of their trusts.

"10th. Said Home and properties in possession of said trustees and their successors, or in the possession of said corporation, and all papers and books and all the affairs of said trust, shall, at all reasonable times, be open to the visitation, and inspection of the governor of the state of Washington, the mayor of the city of Seattle, or any person so desiring to visit and inspect.

"11th. Except as in this will limited, my said trustees and their successors and said corporation, shall have as full power to sell, convey and manage any

property of the trust as if they were absolute owners thereof, but shall have no power to mortgage or encumber real estate, except that they may lease real estate, but not for a term exceeding five (5) years, and no person purchasing from or dealing with said trustees or their successors or said corporation shall be obliged to look to the application of any consideration or purchase money, or be under any obligation or responsibility or charged with any duty with reference to said trust.

"12th. It is my will that at the end of each calendar year after the administration of my estate by my executors shall have closed, all lawful expenses (such as taxes, special assessments, insurance, interest, ordinary repairs, expenses of light, water, heat, power, collecting rents, obtaining and ousting tenants, janitor's or keepers salaries, legal expenses and sums payable as hereinafter in this will provided to legatees), attending the management of my estate that have become due within the year then ending, and are unpaid, shall be paid, and that ten per cent (10%) of the remaining net rents, issues, profits and increase of my estate for the said year shall be an annual and full compensation of said trustees and their successors, and of the trustees or directors and officers of the corporation hereinbefore in the 7th Subdivision of this item mentioned, for the year then ending, and that all the balance of said rents, issues, profits and increase shall be so used as in the judgment of the said trustees and their successors or said corporation will best foster, broaden and prosper the charity hereinbefore proposed.

"13th. It is my will that at the beginning of their trusts, and at the beginning of each calendar year thereafter, that is to say: As of noon of the first day of January of each calendar year thereafter, my trustees or their successors, or said corporation, shall make a faithful, true and full inventory and fair appraisement of all the real and personal estate belonging to the trusts mentioned in this item, and that such real estate and personal property, so inventoried and appraised shall be regarded until the time of the next subsequent inventory as a principal fund out of the rents, issues,

profits and increase of which, all the expenses and out-
lays incident to the administration and management
of said trusts, until the beginning of the year next
after such inventory, are to be defrayed; provided,
however, that expenses of any calendar year may be
defrayed out of the rents, issues, profits and increase of
that year even after the close of that year; and pro-
vided that reasonable permanent improvements to real
estate other than ordinary repairs may be made out of
property constituting part of such principal fund; and
provided further, that no increase in value of real or
personal estate so to be appraised shall be deemed in-
crease, issue or profits out of which expenses or out-
lays incident to the administration and management
or compensation for administration may be defrayed.''

The Samuel and Jessie Kenney Presbyterian Home
was incorporated June 20, 1901, by the trustees named
in Mrs. Kenney's will. The executors (the persons
nominated by Mrs. Kenney as trustees were also
named by her as executors to administer her estate)
conveyed to the corporation all of the assets (appraised
at $156,755.17) of the estate. The corporation imme-
diately proceeded with the execution of the trust cre-
ated by the will. As soon thereafter as the condition
of the trust properties warranted, a home or retreat
for aged and infirm people was erected as provided in
Item Six of the will; and the home has ever since been
operated in the manner and way directed by the will
as interpreted by the trustees of the corporation.

From date (1901) of organization of the corporation
until February, 1931, no complaint was made to the
trustees respecting the manner in which they were
administering the trust. In February, 1931, certain
members of the session of the First Presbyterian
Church expressed the view that the trustees were not
administering the trust as the will directed, whereupon
a committee of the session was appointed to investi-

gate and report to the session. A certified public accountant was employed by the corporation to assist the committee in its investigation of the acts of the corporation and the acts of the trustees of the corporation. Under date of November 3, 1931, the committee's report of the result of its investigation was submitted to the session. That report reads, in part, as follows:

"We therefore believe that a consistent if not a technical compliance with the terms of the Will has been accomplished. We doubt very much if there has been a breach of trust, or a legal departure from the terms of the Will, and our finding is that it does not constitute a cause for the removal of the trustees. . . .

"We therefore recommend that the Trustees be requested to submit to the courts the entire question of compensation and apply for approval of the present plan of operation under the will.

"The board of trustees should be required to furnish the Session with copies of their annual and other important reports, also keep the Session reasonably informed of any important matters affecting the Home.

"If time had permitted, it might have been wise to look further into the operations of the Home. However, we believe from our study of the will that the testatrix intended to give the trustees very broad authority in the management of the estate and of the Home.

"Furthermore, we feel that there may be some question as to the extent of the authority or jurisdiction of the Session to interfere in matters pertaining to the management of the trust and the Home and we might suggest that the Session consider the advisability of appointing a committee to co-operate with the Board of Trustees in securing from the court a ruling as to the Session's responsibility under the Will.

"In closing, we wish to call attention to the fact that all the former and present trustees of the institution are men of undoubted integrity and good standing in the community and to state that in our opinion where mistakes have been made they have been errors of

judgment, and that we believe the Trustees have acted in good faith.''

Pursuant to the recommendation of the committee of the session, The Samuel and Jessie Kenney Presbyterian Home and its five trustees commenced an action to obtain an adjudication, first, as to the powers and duties of the session (the church's governing body) of the First Presbyterian Church of the city of Seattle; second, as to the powers and duties of the trustees; and third, as to the method of computing the compensation of the trustees for their services in administering the trust. The state of Washington was made a party defendant, as the home is a public charity. Josiah Thomas, R. J. Logan and James M. Rutherford, as members of the session of the First Presbyterian Church, at request of the session, were made defendants as representatives of the session, which consists of approximately eighty-four members. The evidence sustains the trial court's findings, which are summarized as follows:

Immediately following the transfer of the assets of the Kenney estate to The Samuel and Jessie Kenney Presbyterian Home, which was incorporated in June, 1901, the corporation proceeded to execute the trust created by Mrs. Kenney's will. A home or retreat for aged and infirm people was erected as soon as the condition of the trust properties warranted such construction. To provide funds for that purpose, it was necessary for the trustees to sell the real property described in paragraph 14 of item six of the will. In 1907, pursuant to the provisions of that paragraph, the trustees requested and obtained the unanimous consent of the session of the First Presbyterian Church to make the sale. The funds derived from that sale were utilized in the purchase of a site in Seattle, on which was erected the present home.

Only so much of the interior of the home was completed as was necessary to accommodate members which the trustees believed the income then derived from the estate would maintain. Considerable publicity was given to the formal opening of the home on February 22, 1909. The moderator of the session of the First Presbyterian Church was present and delivered an address. From time to time, as funds became available for that construction and the maintenance of the home, the unfinished portion of the building was completed. Shortly after the home was erected, a part of the estate—mining claims in Alaska and acreage in Pierce county—from which it was anticipated considerable revenue would be derived, proved to be worthless. The charity was dependent upon the income from its invested capital and the gifts of friends and such other funds as the trustees in the management of the charity could make available.

In the administration of the charity, the plaintiff trustees and their predecessors in office received and maintained in the home as many members as the funds available for their support would justify. In order to serve the maximum number of aged people and insure their maintenance for life, the trustees required persons received into the home to make such contributions of cash and property as they were able, for application toward their own maintenance. It was found advisable to establish a uniform rule as to these requirements. At the time of the commencement of this action, the contributions (termed "life membership fees") required of those seeking life membership in the home were as follows: Persons from sixty to sixty-nine years of age, inclusive, three thousand dollars; persons from seventy to seventy-four years of age, inclusive, twenty-five hundred dollars; persons from seventy-five years of age and up, two thousand

dollars. These contributions were credited to a special membership account, against which was debited sixty dollars monthly for each of the contributing members until such time as the amounts contributed by each of the respective members were exhausted. Thereafter, such contributing members were cared for and maintained by the home as charity members.

The trustees reserved the right to dismiss any member from the home if reasons developed precluding proper care of such member in the home, or if such member found the home uncongenial and desired to depart therefrom. In either event, the balance remaining from his or her contribution, after deduction therefrom of maintenance charge of sixty dollars monthly, was returned to such member.

Others, termed "monthly contributing members," were received into the home. This class consisted of those who were unable to pay any stated amount, but who were able, through friends and relatives, to pay, monthly, the reasonable cost of their maintenance in the home.

In the management and operation of the home, no private profit or gain was allowed to accrue to anyone. All sums received in excess of the cost of maintenance of persons in the home were credited to the capital or endowment fund of the home. The trustees carefully examined each person admitted to membership in the home to ascertain whether such person was eligible, under the requirements prescribed in Mrs. Kenney's will, to membership. No person was refused admittance to the home because he or she would be a wholly charity member, unless at such time the plaintiffs were without funds with which to maintain such persons. During all of the time the home has been in operation, as many charity members as the funds available for their support would justify have been cared

for in the home. The funds available for the mainte-
nance of the home and the members therein were ex-
pended each year to within what the trustees believed
to be the limits of safety for prudent and conservative
management.

The report made in 1930 by the trustees and filed
for the examination and inspection of those interested,
discloses that, in 1930, sixty-nine persons, forty-two
women and twenty-seven men, were in the home. They
were classified by ages as follows: Sixty to seventy
years of age, five; seventy to eighty years of age,
thirty-nine; eighty to ninety years of age, twenty;
ninety to one hundred years of age, five. No member
was ever required to leave the home because the trus-
tees lacked funds with which to maintain such member.
When this action was instituted, about one-half of
those in the home were being maintained therein as
wholly charity members.

The policy of accepting real property in payment of
life membership fees was changed. A rule was
adopted, and adhered to in most cases, of requiring
persons who desired entrance into the home to sell
their property holdings so that their membership fee
could be paid in cash. This enabled the trustees to de-
termine in advance what money would be available for
the support and maintenance of the members of the
home. Some deviations were made from that rule.
When real estate was received by the trustees in lieu
of cash for membership fees, or in the event of gifts
of real property to the home, it was the policy of the
trustees to charge to the property itself all expenses
incurred in maintaining and preserving such property
until the time the property could be made income-pro-
ducing; that is, until such time as the income from the
property so received exceeded the expenditures neces-

sary to preserve and maintain it. In this way, the trustees were enabled to ascertain to what extent gifts or contributions of that kind were beneficial, thus assuring the necessary uniformity of income for the support of the home.

''That the trustees have exercised not only care, prudence and good judgment in the administration of the said trust, but have acted during its entire administration in absolute good faith, and have attempted to proceed strictly in accordance with the provisions of the Will of said decedent. The said trustees have carefully examined each and every person received into the Home as a member; have established the rules and regulations for the management of the Home itself and the conduct of the members therein; have exercised their judgment in all matters relating to the management of the trust fund, and have complied with all of the requirements of the Will touching the accounting of the trust funds and the inventorying and appraisement of the trust property. That the Home itself and all properties constituting the trust estate have at all times been open to examination and inspection. That all of the trust papers, books of account, records of the affairs of the plaintiff corporation, and the doings and acts of the trustees since the establishment of the said trust, have been open to the inspection and visitation of any and all persons desiring to visit and inspect the same. That the report for the year 1930 records the fact that during that year 3,359 visitors were admitted to the Home. That the trustees, each and every year, have prepared and kept on file for the inspection of persons desiring to examine the affairs of the Home, a careful and complete summary or balance sheet showing the assets and liabilities, the income and expenditures, the yearly report and inventory and appraisement of properties belonging to the corporation, the insurance carried, itemized lists of all real and personal property, including mortgages, bonds, contracts and other properties belonging to the corporation, which summary gives a full and complete statement of said items, a complete statement of the life membership accounts, the number of persons in the Home at

the beginning of the year, the number received during the year, the names of each and every person in the Home, together with the date of birth, the age, the number of deaths and the number of persons who remove from the Home and the reasons therefor,—the names of the employees and the character of employment and salaries paid, as well as the list of rooms and the occupant of each and every room, which reports, covering the entire administration of this trust, have been carefully kept and so simply arranged and analyzed that any person could understandingly examine the same.''

The trustees took, as compensation for their services, ten per cent of the net sum remaining after deduction of all lawful expenses attending the management of the trust estate, for each calendar year, and used the balance of the rents, issues and profits and increase of the estate in such manner as in their judgment would best foster, broaden and prosper the charity. All funds contributed to the trust estate to become a part of the principal or endowment fund were made a part of such fund; and all funds contributed as gifts, donations or accessions to the current expense supplemented the current budget expense of the home as an increase thereof. Permanent improvements of all kinds, including special street improvements, were charged to the capital or principal of the trust, and all lawful expenses in the management of the trust were charged to ''income.'' All accounts of the trustees, including the investment and expenditure of all funds and the manner and way in which the compensation of the trustees had been calculated, from the organization of plaintiff corporation in 1901 until February, 1931, were open to the inspection of any person desiring to examine the same.

Not until February, 1931, were the trustees apprised of any criticism of the manner and way in which the

trust had been administered. At that time, certain members of the session expressed the belief that the trustees were not administering the trust as in the will directed. A committee was appointed to make an investigation and report the result thereof to the session. Pursuant to the recommendation contained in that report, as recited above, plaintiffs commenced this action.

Consonant with the conclusions of law deduced from the foregoing findings of fact, the following decree was entered by the trial court:

"That the construction of the Will of JESSIE KENNEY, admitted to probate in the superior court of the state of Washington for King county, as cause No. 3558, in probate, adopted by the plaintiff trustees and their predecessors in office, in the execution of the trust in the said Will created, is hereby declared to be the true and correct construction, and all of the acts of said trustees in the execution of their said trust from the commencement thereof to the institution of this action are hereby ratified and approved.

"That by the terms of the said Will the Session of the First Presbyterian Church of Seattle, Washington, has the power, and it is its duty, to fill all vacancies in the said Board of Trustees of the plaintiff corporation, as vacancies occur from time to time, so that there shall be at all times five trustees in number—no more and no less—the said election to be from the class indicated, and the said Session to evidence such election in the manner specified in the said Will.

"That in event any trustee of the plaintiff corporation shall cease to be a resident of the county in which the city of Seattle shall for the time being be, or shall continue to be absent from the said county for more than six months, or shall cease to be a member in good and regular standing in some Protestant Evangelical church, and such trustee is not removed by the other acting trustees of the plaintiff corporation, then the said Session has the power, and it is its duty, to remove such trustees.

"That the Session of the First Presbyterian Church of Seattle, Washington, may also remove a trustee for any good cause shown, but what constitutes good cause shown, other than those enumerated, can only be determined by a proceeding properly brought in a court of equity having jurisdiction thereof. After a decree of such court has been obtained, adjudicating that certain act or acts of a trustee constitutes good cause for removal, then it becomes the duty of said Session to file a formal deed of removal and appoint a successor.

"That the plaintiff corporation was organized as directed in the said Will and all of its corporate powers are exercised through its Board of Trustees, and no other person or persons, subject only to supervision by the court, and by the state of Washington, by reason of its being a public charity, and the trustees of said plaintiff corporation have full power and authority in the selection of members of the said Home from the classes specified in the said Will, and have full power and authority to make all rules and regulations for the conduct and government of the said Home, and have full power and authority to remove one of their own number in the event such trustee shall cease to be a resident of the city of Seattle or the county in which the said city of Seattle is located, or shall be absent therefrom for a period of more than six months, or shall cease to be a member in good and regular standing of some Protestant Evangelical church.

"That the said trustees also have full power and authority to receive other donations, accessions, accumulations, gifts, and any new and additional benefactions, and to manage and apply the same in such manner and way as their judgment shall dictate, provided the same can be applied in harmony with and in aid of the charitable uses created by the said Will.

"That the trustees of plaintiff corporation also have full power and authority to sell, convey and manage any property of the said trust, other than the present site of the home, or any part thereof, as if they were the absolute owners thereof, except that said trustees have no power to mortgage or encumber real estate other than a lease of the same for a term of years not

exceeding five, except when otherwise directed by a court of equity in the exercise of its jurisdiction.

"That the trustees, at the end of each calendar year, after deducting all lawful expenses, to-wit: taxes, special assessments, insurance, interest, ordinary repairs, expenses of light, water, heat, power, collecting rents, obtaining and ousting tenants, janitor's or keeper's salaries, legal expenses, and sums payable to legatees, attending the management of said estate that have become due within the year, shall have been paid, also have the power and authority to deduct 10% of the remaining net rents, issues, profits and increase thereof for their annual and full compensation, and they also have the power, and it is their duty, to use all of the balance of said rents, issues, profits and increase thereof in such manner and way as in their judgment will best foster, broaden and prosper the charity created by the said Will; Provided that special city assessments levied for the construction of street improvements in the city of Seattle, King county, Washington, which in the judgment of said trustees constitute permanent improvements, are not lawful expenses which, by the terms of the said Will, when paid, are to be charged to 'income,' but are permanent improvement expenditures, and all sums disbursed in the payment of such permanent improvements may be charged to the 'principal' fund by said Trustees.''

From that decree, the three members of, and representing, the session of the First Presbyterian Church have appealed. The state of Washington did not appeal from the decree.

██ Appellants first contend that the trial court erred in holding that the authority of the session was limited to the appointment of trustees when a vacancy occurs, with a restricted power of removal.

While conceding that the will does not denominate the session as a visitor, appellants urge that the language, as follows, of paragraph 6, item six, of the will, was a grant to the session of full visitorial powers:

"It is my will that the succession of trustees in the trusts hereby created, shall never fail and that the said Session of the said First Presbyterian Church shall be free and have power to exercise at any and all times, any and sufficient jurisdiction to provide for and secure such succession and the faithful carrying into effect of all and singular the trusts in this will created or defined."

It is insisted that the session was clothed with general visitorial power without limitations and unhampered by prescribed procedure; and that the power granted to the session "implies authority in the session to act to correct abuses and irregularities, and of supervision."

The authorities cited by appellants in support of their contention that the session was vested with visitorial and supervisory powers are either not in conflict with our disposition of the question raised or follow a rule applicable to facts which are not present in the case at bar.

Mrs. Kenney's gift (see paragraph 1 of item six of the will quoted above) of a home or retreat for infirm persons of both sexes, more than sixty years old, irrespective of their religious or political views, "who by reason of poverty are, in the judgment of said trustees or their successors, unable to adequately provide for themselves," is a public charity.

"A gift is a 'public' charity when there is a benefit to be conferred on the public at large, or some portion thereof, or upon an indefinite class of persons. Even if its benefits are confined to specified classes, as decrepit seamen, laborers, farmers, etc., of a particular town, it is well settled that it is a public charity. The essential elements of a public charity are that it is not confined to privileged individuals, but is open to the indefinite public. It is this indefinite, unrestricted quality that gives it its public character." 5 R. C. L., p. 293, § 3.

The charitable trust created by Mrs. Kenney is of public concern—it is a public charity; hence, only the state can invoke the superintending power of the courts over the administration of the trust.

"A charitable trust is of public concern and the attorney-general is the protector of the interests of the public, or, what is the same thing, of the indefinite and fluctuating body of persons who are the cestui que trust. Unless, however, a gift is definitely to a charity such as equity recognizes, and one more or less public or general, there is no right in the public to serve as a ground for intervention on the part of the attorney-general. If it is of a public character, not only may he intervene in an action brought for the construction of the will, but he is a proper party defendant as representing the public interests, for no final and conclusive settlement could be had unless the state were represented. Moreover, he is the proper person to institute proceedings for the enforcement of a public trust or charity, for which purpose he may file an information either on his own motion or on the relation of any party concerned. In fact, the attorney-general is the only one who can properly invoke the superintending power of the courts over the administration of such trusts." 2 R. C. L., p. 923, § 12.

See, also, *Dickey v. Volker,* 321 Mo. 235, 11 S. W. (2d) 278, 62 A. L. R. 858; *Green v. Blackwell,* 35 Atl. (N. J.) 375; *Dillaway v. Burton,* 256 Mass. 568, 153 N. E. 13.

We do not disagree with the principle stated in the following quotation by appellants:

"To all eleemosynary corporations a visitatorial power attaches as a necessary incident; and in this connection it must be borne in mind that the words 'charitable' and 'eleemosynary' are practically synonymous, the latter designating technically a class of corporations organized for charitable purposes. These corporations are composed of individuals, and they are subject to infirmities, and are liable not to carry out the purposes of the original giver of the funds. The

law, therefore, from very early times has provided that there shall somewhere exist a power to visit and to inquire into and correct all the irregularities and abuses, and to see that the charity is being applied according to the intention of the donor. If the state is the only donor, then the power to appoint visitors and the visitatorial power vests in the state. But, if the charity is one resting solely on a private foundation, then the visitatorial power rests originally in the donor and at his death in his heirs, and he may impart that power to any person or persons that he may see fit, and no formality or precise language is required in imparting such power, although the giving of the power of 'supervision' is not equivalent to the giving of the power of 'visitation'." 11 C. J., p. 364, § 79.

However, the rule applicable in the case at bar is clear, if the two sentences of the same section of 11 C. J. 364 are quoted; they read as follows:

"Furthermore, where the founder has thus appointed a general visitor, and for some cause the latter's function shall have been suspended, the power of visitation does not, ipso facto, return to the founder or his heirs, but is exercised through the courts of the land properly invoked. If the objects of the charity are not incorporated, but certain trustees are incorporated to manage the charity, the visitatorial power is deemed to belong to such trustees in their corporate capacity, and there is no other visitor."

Mrs. Kenney's will provides that there shall be no more and no less than five trustees. The testatrix designated five "dear friends" and directed them to found and thenceforth forever maintain a home for such aged people, as recited above, as the five trustees named, or their successors, "shall from time to time approve and appoint, who by reason of poverty are, in the judgment of said trustees or their successors, unable to adequately provide for themselves." The testatrix further directed that, within a reasonable time after her death, the trustees form a corporation

under the name of The Samuel and Jessie Kenney Presbyterian Home,

" . . . having perpetual succession and with powers proper to receive and maintain such home, and to promote and execute the trusts in this item created, and to receive, manage and apply in harmony therewith, or in aid thereof, any new or additional benefactions. . . . My said trustees and their successors and said corporation, shall have as full power to sell, convey and manage any property of the trust as if they were absolute owners thereof, but shall have no power to mortgage or encumber real estate. . . . At the end of each calendar year . . . all lawful expenses (such as taxes, special assessments, insurance, interest, ordinary repairs, expenses of light, water, heat, power, collecting rents, obtaining and ousting tenants, janitors' or keepers' salaries, legal expenses and sums payable as hereinafter in this will provided to legatees), attending the management of my estate that have become due within the year then ending, and are unpaid, shall be paid, and that ten per cent (10%) of the remaining net rents, issues, profits and increase of my estate for the said year shall be an annual and full compensation of said trustees and their successors, and of the trustees or directors and officers of the corporation hereinbefore in the 7th Subdivision of this item mentioned, for the year then ending, and that all the balance of said rents, issues, profits and increase shall be so used as in the judgment of the said trustees and their successors or said corporation will best foster, broaden and prosper the charity hereinbefore proposed."

Mrs. Kenney's will contains no language from which it can be even inferred that the testatrix intended to vest in any one authority in conflict with or in derogation of the powers definitely and expressly delegated to respondent trustees. The founder of the charity directed that a corporation be created. The founder nominated five persons as trustees of that corporation. The founder conferred on those trustees and their suc-

cessors the full power of the management of the property conveyed to the corporation created for the purpose of the charity. United with the other powers vested solely in the trustees, was the power of visitation.

In *Trustees of Union Baptist Ass'n v. Hunn*, 7 Tex. Civ. App. 249, 26 S. W. 755, the court of civil appeals of Texas followed the rule applicable to the facts in the case at bar. The court said:

"But the charter of the university corporation conferred upon it capacity to own and hold real estate and other property, and to convey same. It also gave to the board of trustees the full management and government of the university and all of its affairs and property; and no right or interest in the property or control over the affairs of the corporation or the school was recognized to exist in any other person or body. . . . An individual who conveys property in trust for charitable purposes has, unless he should assign it to another, what is called the 'visitatorial power,' in the exercise of which he may prescribe rules for its management and for the administration of the trust, and may govern and control the trustees, inspect their proceedings, and correct abuses in their conduct. But this is a power which may be assigned; and the incorporation of trustees, under a charter which confers upon them, as does that in question, the full power of management of the property and of the institution, divests such right of the founder and vests it, as well as the absolute title to the property conveyed, in the corporation."

*Dartmouth College v. Woodward*, 17 U. S. 518, 4 L. Ed. 629, is a leading case in support of the rule that, where trustees are incorporated to manage the charity, the visitorial power rests in such trustees. Appellants also cite that case in support of their contention. Their quotation (p. 673), as follows, therefrom is not apt, in view of the fact that, in the case at bar, the visitorial power was vested solely in the trustees, and

was not divided among various persons (the session and the trustees) or subject to any modifications or control.

"No technical terms are necessary to assign or vest the visitatorial power; it is sufficient if, from the nature of the duties to be performed by particular persons, under the charter, it can be inferred, that the founder meant to part with it in their favour; and he may divide it among various persons, or subject it to any modifications or control, by the fundamental statutes of the corporation. But where the appointment is given in general terms, the whole power vests in the appointee."

The following language in that opinion, to the effect that, where the objects of the bounty are incorporated, the whole legal interest is in trustees and can be asserted only by them, is pertinent:

"In the construction of charters, too, it is a general rule, that if the objects of the charity are incorporated, as for instance, the master and fellows of a college, or the master and poor of a hospital, the visitatorial power, in the absence of any special appointment, silently vests in the founder and his heirs. But where trustees or governors are incorporated to manage the charity, the visitatorial power is deemed to belong to them in their corporate character. . . .

"But an eleemosynary, like every other corporation, is subject to the general law of the land. It may forfeit its corporate franchises, by *misuser* or *non-user* of them. It is subject to the controlling authority of its legal visitor, who, unless restrained by the terms of the charter, may amend and repeal its statutes, remove its officers, correct abuses, and generally superintend the management of the trusts. Where, indeed, the visitatorial power is vested in the trustees of the charity, in virtue of their incorporation, there can be no amotion of them from their corporate capacity. But they are not, therefore, placed beyond the reach of the law. As managers of the revenues of the corporation, they are subject to the general superintend-

ing power of the Court of Chancery, not as itself possessing a visitatorial power, or a right to control the charity, but as possessing a general jurisdiction, in all cases of an abuse of trusts, to redress grievances and suppress frauds. . . . And where a corporation is a mere trustee of a charity, a Court of Equity will go yet further; and though it cannot appoint or remove a corporator, it will, yet, in a case of gross fraud, or abuse of trust, take away the trust from the corporation, and vest it in other hands.''

We agree with appellants that the question whether testamentary appointees are visitors depends upon the nature of the powers delegated to such appointees by the founder of the charity, rather than on the name by which the appointees are called in the instrument of foundation; and that the visitorial power may be confided by the founder of the charity to some person or persons other than the trustees of the corporation organized for the purpose of the charity. Zollmann on Charities, p. 419, § 604. The weakness in the argument of appellants lies in the fact that the power was not confided to any one other than the trustees.

*Eustace v. Dickey,* 240 Mass. 55, 132 N. E. 852, 859, cited by appellants, is distinguishable on the facts from the case at bar. In the case cited, the right of removal of the trustees is based upon the following provision in the trust deed executed by Mary Baker Eddy:

''The First Members together with the directors of said Church shall have the power to declare vacancies in said trusteeship *for such reasons as to them may seem expedient.*'' (Italics ours.)

No similar provision is contained in the will of Mrs. Kenney.

*State ex rel. College of Bishops, etc. v. Board of Trust, etc.,* 129 Tenn. 279, 164 S. W. 1151, is an apt authority. The supreme court of Tennessee held that, where the charity vests (as in the case at bar) in trus-

tees for the benefit of those who are to partake of the charity, the visitorial power belongs to the trustees and "no visitor can arise by implication." The court said:

"At common law, the right of visitation vests only where the persons interested in the charity were themselves incorporated, and not where disinterested trustees were appointed and incorporated to administer the trust for the beneficiaries.

"In the leading case on this subject it is said by Lord Holt:

" 'For it is fit the members, that are endowed and that have the charity bestowed upon them, should not be left to themselves (for divisions and contests will arise amongst them about the dividend of the charity), but pursue the intent and design of him that bestowed it upon them.'

" 'Now, indeed, where the poor or those that receive the charity are not incorporated, but there are certain trustees who dispose of the charity according to the case in 10 Coke, there is no visitor; because the interest of the revenue is not vested in the poor that have the benefit of the charity, but they are subject to the orders and direction of the trustees. But where they who are to enjoy the benefit of the charity are incorporated, then, to prevent all perverting of the charity, or to compose differences that may happen among them, there is by law a visitorial power.'

"*Phillips v. Bury,* 2 Term R. 352.

"In *Green v. Rutherforth,* 1 Ves. Sen. 471, Lord Hardwicke said: 'If the charity is not vested in the persons who are to partake, but in the trustees for their benefit, no visitor can arise by implication.'

" A like rule is recognized in the *Dartmouth College Case,* 4 Wheat. 563, 565, 566, 645, 675, 676, 4 L. Ed. 629; *Allen v. McKean,* 1 Sumn. 276 Fed. Cas. No. 229; *Sanderson v. White,* 18 Pick. (Mass.) 328, 29 Am. Dec. 591.

"In 2 Kent's Commentaries (13th Ed.) 300, it is said: 'Where governors, or trustees, are appointed by a charter, according to the will of the founder, to man-

age a charity (as is usually the case in colleges and hospitals), the visitorial power is deemed to belong to the trustees in their corporate capacity.''

If, as contended by appellants, the powers granted to the session in paragraph 6 of item six of the will implies authority in the session to correct abuses and irregularities and of supervision, such implied power would be in derogation of the powers expressly granted to the trustees. Appellants argue:

''This power should be lodged somewhere, and if the will does not lodge it in the session, equity would lodge it in the state, and the state is illy prepared to give such duties proper attention.''

As stated above, the managerial power of the charity rests solely in the trustees; the testatrix expressly so directed, and there is no language in the will from which it can be reasonably inferred that Mrs. Kenney intended to divide the control or power of the trustees with the session. In the administration of the trust, the trustees are, of course, subject to the superintending power of the equity courts, which possess a general jurisdiction in all cases of abuse of trusts. Only the state, acting through the *Attorney General,* either on its own initiative or on the relation of some other party, can invoke that power.

The session does not have either visitorial or supervisory power over the acts of respondent trustees.

Removal of trustees: In case any trustee ceases to be a resident of the county in which the city of Seattle shall for the time being be, or absents himself from that county for more than six months, ''or ceases to be a member in good and regular standing in some Protestant Evangelical Church,'' the other trustees may, by following the procedure prescribed in the fourth paragraph of item six of the will, remove such trustee from his trust. Paragraph four of item

48

six of the will further provides for removal by the session of any of the trustees in case of like absence or for good cause shown.

"Or in case of like absence or for any good cause shown the said Session of the First Presbyterian Church may remove any one or more trustees from his or their trust and another or others, qualified as herein provided, select and appoint as aforesaid in place of the trustee or trustees so removed, and in each case both the deed of removal and of appointment shall be filed and recorded in the office of the auditor or recorder of such county."

The trial court correctly, contrary to appellants' contention, held that the trustees can only be removed by the session for "good cause shown" after a hearing by a court of competent jurisdiction.

"GROUNDS FOR REMOVAL: a. In General. What constitutes a sufficient reason for removing a trustee is a matter peculiarly within the discretion of the court, which should be guided by considerations of the welfare of the beneficiaries and of the trust estate. But the power of removal, especially of trustees appointed by will, ought to be exercised sparingly. There must be a clear necessity for interference to save trust property. It is not every mistake or neglect of duty which will induce a court to remove a trustee. There must be such gross negligence or misconduct as to evidence a want either of capacity or fidelity, putting the trust in jeopardy. Mere failure in the discharge of duties on account of mistake or misunderstanding is not ground for removal, unless such failure shows a want of the proper capacity to execute the duties. Still less will the court interfere because of an injudicious exercise of discretion, or refusal to exercise a purely discretionary power for the advantage of the estate. And even acts of imprudence or neglect are usually treated as reasons for making the trustee give recompense for the wrong or error rather than as ground for superseding him in his office. Good faith and honesty will not, however, always save a trustee from removal from his office." 39 Cyc. 261.

█ Appellants next contend that the trial court erred in refusing to hold that the trustees had no authority under the will to charge and collect fees from either monthly boarders or life members, and in holding that the trustees were authorized to render services to any member for compensation, or otherwise than gratuitously.

*Dillaway v. Burton,* 256 Mass. 568, 153 N. E. 13, cited by appellants and respondents, does not lend support to the appellants' position. The court there held that it was the exclusive function of the *Attorney General* to correct abuses in the administration of a public charity by the institution of proper proceedings. In that case, as in the case at bar, the charity was not to be limited to those who were entirely destitute of all property. The persons eligible for admission to the hospital were described as those without necessary means of support and incapable of obtaining a comfortable livelihood by reason of physical disability. The court said:

"The persons eligible for admission to the hospital are described as those 'who are without necessary means of support and are incapable of obtaining a comfortable livelihood by reason of chronic or incurable disease or permanent physical disability.' We are of opinion that applicants to be eligible need not be entirely destitute of all property. Nor are they to be excluded if friends or relatives legally bound to support them refuse to do so; but if an applicant has friends or relatives who are not only able but are willing to support him or her comfortably and furnish such applicant with proper medical and surgical treatment outside the hospital, such person should not be admitted. The plaintiff is so instructed."

Mrs. Kenney did not limit her charity to those who were entirely destitute. Absolute destitution was not the test of eligibility for admission to the home. Mrs.

Kenney directed, in language (paragraph 1, item six of the will) very little different from the language in the cited case, that the persons eligible for admission to the home were those

" . . . who by reason of poverty are, in the judgment of said trustees or their successors, unable to adequately provide for themselves, and where such persons, irrespective of their religious or political views, shall be gratuitously supplied as far as may reasonably be, with the shelter, care and comforts of a home."

We are convinced by our examination of the will, as stated in the report of the committee appointed by the session to investigate the administration of the charity,

" . . . that the testatrix intended that the charity of the Home should be extended to those who could partially, but not adequately provide for themselves, as well as those who are wholly unable to provide for themselves."

The will did not direct that a home be established for the maintenance solely of indigent people. It was not contrary to any provision of the will—in fact, the will directs the trustees to receive donations—for the home to receive donations. The language of the will clearly expresses the purpose of Mrs. Kenney to assist those who were not entirely destitute of property.

The facts in *German Aged People's Home v. Hammerbacker*, 64 Md. 595, 3 Atl. 678, 54 Am. Rep. 782, are much like the facts in the case at bar. The court said:

"The object of the incorporation of 'The General German Aged People's Home of Baltimore City' was certainly a commendable one. Its aim was to furnish to aged and indigent Germans a home for the residue of their lives. It was intended for those only who were over sixty years of age, who were unable to work, and

possessed of a good character, and without the means to secure for themselves a comfortable home. But with all these requisites before an applicant could be admitted, an admission fee, ranging from $300, the highest, to $150, the lowest, must be paid. This admission fee might be paid by the applicant himself, if he possessed sufficient means, or by his friends or relatives, if he was unable to do so. Another requisite for admission into the institution was, that the applicant should transfer to the institution all the property that he had at the time. It is this latter provision that creates the difficulty in this case, and which will require examination.

"It is the primary purpose of this corporation to furnish homes for those who are unable to support themselves in any degree of comfort, and not for those who are so able. It is not its object to furnish for the small admittance fee of $300 or $150 a *home for life* to those who still hold property, to do as they please with. To allow that would be to convert the institution into a very cheap boarding-house, where, in addition to comfortable board and lodging for life, the inmate would be entitled to medical attendance if sick, and a decent burial at his death, and all this for $300 at most. But there is and must be a large class of persons, who own and possess more property than enough to pay the admission fee, but not enough to support themselves in the comforts they would find at the Home. It was for this class that the provision in the constitution (Art. 5, sec. 2, paragraph c) required the inmate to transfer to the corporation all the property he might have, and it is this provision that is supposed to be *ultra vires*. But in our opinion it is not.

"The certificate of incorporation provides, 'That the corporation so formed, is a corporation for the purpose to establish and maintain in the City of Baltimore, or within its vicinity, an institution under the name of 'The General German Aged People's Home,' wherein aged people of both sexes, of good moral character, *under such conditions and rules as may be prescribed by the constitution and bylaws of this corporation, may find an asylum.*'

"Among the rules laid down in the constitution, is the one heretofore referred to, that one of the conditions of admission was the transfer to the institution of all the property of the applicant . . . But the constitution provides that the revenues of the corporation should be derived from the yearly dues of members, admission fees, donations, presents, legacies, and gifts. Now under this clause, to say nothing of the general law, a person, not an inmate or applicant, could certainly donate or give property or money to the institution. If A, not an inmate, presented the corporation with $1,000, no one would doubt its power to receive it, under the head of a voluntary donation or gift. It certainly would be a hair-splitting rule to say that if B, who was an inmate, or an applicant, did the same, it would not be a donation or gift. It is not a purchase, for the inmate gets his right to be there, from his age, his good moral character, and the payment of his admission fee. He may not have a cent of money or property to convey, but if the other conditions are complied with, he is admitted. It is as properly classed as a voluntary donation, in the one case, as the other. . . .

"Nor is it against public policy for an organized charity like this to receive such donations, it being, as we have shown, within its corporate powers. On the contrary, this and similar charities are directly within the line of a sound and humane public policy. They not only tend to relieve suffering in the individual, but tend to keep them from being a charge upon the general public. For this purpose money is necessary, and they are allowed to receive and appropriate it as their charter allows."

It was not the desire of Mrs. Kenney to make of the home a "poor house." To make her charity effective, she delegated to her "dear friends" discretion as to administrative details. She and her husband dreamed of and planned the creation of a home under such efficient management—that kind of management of which she anticipated her "dear friends" were capable—as would assure permanent care of the members

of the home. Mrs. Kenney knew there were degrees of poverty and individual necessity. Her gift of a home was not confined to those so absolutely destitute that the "poor house" was their only place of refuge.

"No legal difficulties are in the way of making charities effective by delegating discretion as to administrative details. What a testator can do by himself or his agent while alive, he can do by his executor or trustee after his death. Since he might have given the property absolutely to the executors, there is no reason why he may not invest them with discretionary powers for so beneficent an end. 'In all cases of charities founded by wills, broad discretion and ample powers must necessarily be conferred upon the trustees, inasmuch as the testator is attempting to provide for contingencies which will arise after his own death.' He may, therefore, vest in his executor a wide latitude to exercise his own best judgment in carrying out his gift. His will 'may be ascertained by the acts of those to whom he has entrusted discretion and power. Such acts may be justly regarded as the definite expression of his own purpose.' " Zollmann on Charities, p. 258, § 389.

"It is neither usual nor desirable to confine the administration of a hospital exclusively to the indigent. An institution which is in its nature a public charity does not lose such character though an income is received from its beneficiaries. It is none the less a charity because it is discriminating. 'Furnishing board, lodging and nursing to needy persons is among the most familiar and useful of charities, and that which constitutes such an institution a charity is that it does not furnish these things for profit.' An institution from which the rich are not turned away because of their wealth, nor the poor because of their poverty is, therefore, a public charity, so long as payments received from patients or other beneficiaries are devoted to the general purposes of the charity and not to the private benefit of individuals or corporations. 'By this operation, the funds of the institution are not absorbed, but augmented; the charitable object of the asylum is not diminished, but promoted; and the nature

54

of it is not changed but pursued.' The partial payment by students of the cost of educating them 'makes it possible to extend the benefits of the University to a larger body of men and women in search of education than would otherwise be the case, and so long as such contributions are not unreasonable and are not in such an amount that it could be said that the benevolence in the foundation is no longer substantially reflected in the benefits which it confers, then the institution is still charitable.' Charity, therefore, has a significance broad enough to include practical enterprises for the good of humanity operated at a moderate cost to those who receive the benefit. 'Reason and authority are opposed to the proposition that an institution otherwise charitable will be deprived of that character by the mere fact that charges for facilities and services are made to individual members, which not only do not result in profit, but which fail, in the aggregate, even to make the institution self-sustaining'.'' Zollmann on Charities, p. 154, § 219.

"It will not be difficult to illustrate this principle by concrete cases. Settlement work does not cease to be charitable because nominal fees are or may be charged. Corporations may be charitable though some income is received from their beneficiaries.'' Zollmann on Charities, p. 155, § 220.

"Payments by Beneficiaries. Advantages. Such payments result in other advantages. 'The fact that paying patients are taken, the profits derived from attendance upon these patients being exclusively devoted to the maintenance of the charity, seems rather to enhance the usefulness of the institution to the poor; for it is a matter of common observation amongst those who have gone about at all amongst the suffering classes, that the deserving poor can with difficulty be persuaded to enter an asylum of any kind confined to the reception of objects of charity; and that their honest pride is much less wounded by being placed in an institution in which paying patients are also received'.'' Zollmann on Charities, p. 481, § 715.

We are clear that Mrs. Kenney delegated to the trustees discretion in the matter of selection of mem-

bers for the home. We are also clear that the trustees had the right to receive from the members, or their friends or relatives, any contributions of money or property to be used in aid of their support and maintenance in the home. We find no authorities to the contrary.

Appellants next complain of the manner in which the trustees construed the will in dealing with the funds of the trust and in ascertaining their commissions. The construction placed by appellants upon paragraphs 12 and 13 of item six of the will also differs from the construction placed upon the will by the committee of the session of the First Presbyterian Church. That committee stated in its report:

"We are convinced that Mrs. Kenney intended and expected that the Trustees would have two distinct and separate duties to perform. First, to guard and manage the estate or trust. Second, from the income of such trust to found, operate and maintain the Home or charity."

In paragraph 12 of item six, the words "my estate," in the phrase "attending the management of my estate," refer to the endowment part of the estate— that portion of the estate which is invested for the purpose of producing income for the charity. The direction is clear and distinct that, from the gross income from this endowment estate, all lawful expenses are to be deducted. These expenses are those which are incurred in the maintenance of the endowment estate. We agree with the trustees' interpretation that "special assessments" were rightly charged to the "capital" account and not to the "income" account. The costs of permanent improvements should not have been, and were not, paid with the income from this endowment estate.

Respondents' interpretation made available for the

maintenance of the charity approximately thirty thousand dollars more than would have been available under appellants' interpretation. We do not find that one cent has been lost to the charity by reason of respondents' interpretation of the will, nor does it appear that the plan of accounting adopted by the trustees increased their compensation, which has averaged twenty-nine dollars monthly. The evidence was undisputed that these are capital expenditures. Mrs. Kenney directed, in paragraph 13 of item six of her will, that repairs in the nature of "permanent improvements" be charged to "principal."

We do not agree with appellants' contention that, since the home has been inventoried and appraised as. a part of the estate, the amounts expended for its maintenance and the maintenance of its members should be deducted from the gross income before the net income is determined for computation of trustees' compensation.

By paragraph 13 of item six of the will the testatrix directed

" . . . that at the beginning of their trusts and at the beginning of each calendar year thereafter, . . . my trustees or their successors, or said corporation, shall make a faithful, true and full inventory and fair appraisement of all the real and personal estate belonging to the trusts mentioned in this item, and that such real estate and personal property, so inventoried and appraised shall be regarded until the time of the next subsequent inventory as a principal fund out of the rents, issues, profits and increase of which, all the expenses and outlays incident to the administration and management of said trusts, until the beginning of the year next after such inventory, are to be defrayed provided, however, that expenses of any calendar year may be defrayed out of the rents, issues, profits and increase of that year even after the close of that year; and provided that reason-

able permanent improvements to real estate other than ordinary repairs may be made out of property constituting part of such principal fund; and provided further, that no increase in value of real or personal estate so to be appraised shall be deemed increase, issue or profits out of which expenses or outlays incident to the administration and management or compensation for administration may be defrayed.''

The word ''principal,'' as used in the foregoing quoted paragraph, has the same meaning as the words ''my estate'' in the phrase ''attending the management of my estate'' in the twelfth paragraph of item six of the will. Undoubtedly, it was the intention of Mrs. Kenney that fluctuations in the market value of assets of the principal estate should not be permitted to impair the regularity of the income. Otherwise, she would doubtless have indicated that depreciation or capital losses were to be taken out of ''income.''

The argument of counsel for respondents is well and tersely stated as follows:

''Appellants contend that 'depreciation' should be made up from the 'income.' If increase in appraised value is not considered 'income,' then 'depreciation' should not be considered an 'expense.' Again, if 'depreciation' (which is greatest in years of depression), is to be made up from 'income'—then the net revenues of the estate which can be used for the maintenance of the charity would be at a minimum when the need is greatest.''

The record before us discloses no justification for the criticism of the trustees for their method of accounting. There is no warrant for the suggestion that the trustees construed the will, managed the charity and kept their accounts in such a manner as would make their offices as trustees lucrative. This was a trust in perpetuity. In the execution of such trusts, the courts look rather to the intent of the testator than

to the method or mode prescribed for its execution. The rule governing the interpretation of such trusts is stated as follows in 11 C. J., p. 352, § 70:

"In general, the property or funds forming the subject matter of a charity should be applied to the purposes, and for the benefit of the persons or institutions, and in the mode or manner, indicated by the founder; but, where a particular application or mode of administration is not prohibited by the instrument creating the trust, or may be deemed by construction to be within its terms, it may be adopted in order fully and properly to execute the trust and to effectuate the intent of the donor or testator. Sometimes a provision, in the instrument creating the trust, as to a particular application of the funds is considered merely directory; and a power to decide on the best means to employ for carrying out the charitable purpose is sometimes given by implication."

The eight men who have served as trustees (three of whom were appointed by appellants) for thirty years have, as the trial court found,

". . . exercised not only care, prudence and good judgment in the administration of the said trust, but have acted during its entire administration in absolute good faith and have attempted to proceed strictly in accordance with the provisions of the will of said decedent."

The original trustees were "dear friends" of Mrs. Kenney. They were all successful business men. They were all men of integrity, and were moved by a high purpose in the performance of their services in the execution of this trust. They knew the desire of Mrs. Kenney to establish a home for aged people. They desired to, and did, make that dream come true. Starting thirty years ago with assets amounting to one hundred and fifty-six thousand dollars, the trustees builded the home. During that period, almost five hundred thousand dollars have been expended in the

maintenance of the charity. At the end of each year, there has been a cash balance of not less than one thousand dollars. The compensation of the trustees during the thirty years has averaged twenty-nine dollars a month per member. The following statement of assets and liabilities of the charity when the action was instituted reflects the faithful and careful endeavor of the trustees in administering the trust:

```
"Cash .....................    $5,676.88
Investments ................  236,965.88
Life insurance premiums.....      325.72
Land and building (constitu-
   ting the Home)............  105,000.00
Furniture (depreciated value)   3,743.25
                              _____
   Total assets ..............$351,711.73
Current liabilities ....................   $5,314.11
Total account of life members...........   26,135.24
Bequests held for specific uses..........   22,001.98
Capital ................................  298,260.40
                                         _____
   Total liabilities ....................$351,711.73"
```

There is no basis for the assertion that the motive which inspired the trustees to such a careful and painstaking effort in the execution of this trust is found in their desire for financial compensation.

 ██ Appellants contend that, because of their position of trust and confidence, the trustees should not have utilized their relation to the trust property for their own personal advantage. That is, one of the trustees, who was engaged in the business of mortgage loans and insurance, should not have written a part of the fire insurance upon the home; and that another of the trustees should not have sold mortgages to the respondent corporation.

The trust was not subjected to any expense by reason of the transactions, hence they were legitimate. The premium rates for fire insurance are uniform.

No more fire insurance was carried on the home than was justifiable. It would be illegal for the insurance broker to share his commissions with the insured.

The purchase of mortgages by respondent corporation from one of the trustees was not at the expense of the trust. The other trustees passed upon the purchases. There was no showing of negligence or carelessness on the part of the trustees in their investigation of the value of the securities purchased, nor was there any evidence that loss resulted therefrom. The trustee received commissions ranging from one to three per cent on the sale of the securities to respondent corporation. The commissions were not paid by the respondent corporation. The mortgages were taken at their face value, and the security was appraised and passed on by the other trustees.

In *In re Cornett's Estate*, 102 Wash. 254, 173 Pac. 44, we said:

"Where the trustee personally performs services in their nature properly chargeable as current expenses of the estate and for which he might have employed another, there is no good reason why he should not receive reasonable pay for such services when and as they are performed. For a well considered case closely analogous in principle see: *Turnbull v. Pomeroy*, 140 Mass. 117, 3 N. E. 15. See, also, *May v. May*, 109 Mass. 252; *In re Hagerty's Estate*, 97 Wash. 491, 166 Pac. 1139."

It is unnecessary to further extend this already overlong opinion by discussion of other questions raised by appellants, as those questions are without substantial merit. We have carefully examined the voluminous record (the briefs alone comprise 746 pages) and are convinced that the decree should be, and it is, affirmed.

BEALS, C. J., HOLCOMB, STEINERT, and MITCHELL, JJ., concur.