[No. 28564. Department Two. March 13, 1942.]

*In the Matter of the Estate of* CHARLES C. BELKNAP, *Deceased.*

HENRY W. SEIBERT *et al., Appellants,* v. WALTER A. McCLURE, *as Executor, et al., Respondents.*[1]

[1]Reported in 123 P. (2d) 358.

*Caldwell, Lycette & Diamond,* for appellants.

*Edgar S. Hadley,* for respondents Canfield.

*Wm. E. McClure,* for respondent Walter A. McClure.

JEFFERS, J.—This is an appeal by Henry W. Seibert and thirteen others from a decree entered by the superior court for King county, approving the final account of Walter A. McClure, as executor of the estate of Charles C. Belknap, deceased, and distributing the estate.

Appellants raise two questions on this appeal: (1) Is the allowance of twenty-five thousand dollars in fees to the executor, Walter A. McClure, and his attorney, William E. McClure, excessive? (2) Should the Canfield heirs bear their proportionate share of the inheritance taxes and costs of administration? We shall take up the second question first.

Charles C. Belknap, a bachelor, died testate in King county, Washington, on October 27, 1938, at the age of seventy-nine. His will was admitted to probate, and Walter A. McClure, named therein, was duly appointed executor on October 31, 1938. The executor qualified and continued to act up to the time of the hearing on his final account and petition for distribution. This was a nonintervention will, and, as provided therein, Mr. McClure was appointed executor, without bond.

As shown by the inventory filed on December 9, 1938, the estate comprised certain real estate in King county,

consisting principally of unimproved lots, together with the Belknap home, all of which was appraised at thirteen thousand dollars; four thousand shares of the capital stock of the C. C. Belknap Glass Company, a Washington corporation (hereinafter referred to as the Glass Co.), of the appraised value of $153,440; ten thousand shares of the capital stock of Alaska Pacific Mines, Inc., a Washington corporation, of the appraised value of $12,500; 17,500 shares of the capital stock of Muletown Consolidated Mines, Inc., a California corporation, ten thousand shares thereof being evidenced by certificate No. 14, deposited in escrow with the Anglo-California National Bank at Redding, California, and 750 bonus shares to be issued to decedent as one of those who originally financed the enterprise, appraised at $2,625; deposit in First National Bank of Seattle, $1,090.84; deposit in First National Bank of Chicago, $204.98; salary payable by the Glass Co. to Mr. Belknap, $6,149.04; money on decedent's person at death, $17.17; two promissory notes of no appraised value; three thousand shares of preferred stock of Willowcreek Alaska Company, of no appraised value; personal property in residence, together with some personal effects of deceased, of the appraised value of $2,055.

The Canfield heirs above referred to are devisees under paragraphs thirteen and fourteen of the will, which read in part as follows:

"THIRTEENTH: I hereby give and bequeath unto my cousin Alice Canfield of Los Angeles, California, one-half of the shares of mining stock I own in the Alaska-Pacific Mines, Inc., of Anchorage, Alaska. . . .

"FOURTEENTH: I hereby give and bequeath unto my cousin Hattie Canfield of Los Angeles, California, the remaining one-half of the shares of mining stock I own in the Alaska-Pacific Mines, Inc., of Anchorage, Alaska. . . . "

The trial court decreed that the shares of stock above mentioned be distributed to Alice and Hattie Canfield, free and clear of any claim or charge for general taxes, state or Federal inheritance taxes, or costs of administration, and that dividends from such stock, declared and received by the executor since the death of Mr. Belknap, also be so distributed.

Appellants specifically contend that, under paragraph 23 of the will, the testator provided a fund from which was to be paid expenses of administration and all taxes; that, to make up this fund, the testator directed that not to exceed four hundred shares of the Glass Co. stock be sold by the executor; that the proceeds from the sale of four hundred shares of this stock was not sufficient to pay such taxes and costs of administration, and that therefore the Canfield sisters should bear their prorata share of such taxes and expenses.

It is further contended by appellants that the devise to the seventeen individuals named in paragraph 23-1-a is not a residuary bequest, but is a specific bequest.

The theory of the executor at all times, and the theory adopted by the trial court, was that, under paragraphs 2 and 23 of the will, it is plain that it was the intention of the testator that all the expenses of administration and all taxes be paid from the residuary estate, and that all the specific bequests and devises made prior to paragraph 23 should be distributed free and clear from such taxes and expenses, the will being clear and unambiguous on that point, and the estate being solvent. The will provides:

"SECOND: I hereby direct the payment of my funeral expenses, the expenses of my last sickness, all my just debts and liabilities and all estate and inheritance taxes due and payable from my estate and *upon the*

*bequests and devises herein provided for."* (Italics ours.)

The will gave money, specific personal property, and real property to seventeen named beneficiaries. After making such bequests and devises, the will provides:

"TWENTY-THIRD. I hereby direct my executor to sell and turn into money all the property of my estate not *specifically bequeathed or devised* excepting the shares of stock of C. C. Belknap Glass Company belonging to my estate, and I hereby authorize, direct and empower my executor to sell and dispose of, upon such terms and for such prices as he may deem advisable, so many of the shares of the capital stock of C. C. Belknap Glass Company belonging to my estate, not exceeding 400 shares, as in his judgment shall be reasonably necessary, in addition to the proceeds of the sale of other assets belonging to my estate, and such income as he shall receive by way of dividends from the shares of stock of C. C. Belknap Glass Company, to provide a fund *sufficient* to pay all my funeral expenses, the expenses of my last sickness, my just debts and liabilities, general and special taxes and assessments, the estate tax (if any) payable to the United States, and all inheritance taxes due to the state of Washington *upon all bequests and devises* herein and hereby given, the cash bequests hereinabove provided for and the costs and expenses of administration of my estate; and when *all such payments shall have been made,* all of the remainder of such shares of stock, and all of the residue of my estate, I hereby give and bequeath unto Walter A. McClure and the Seattle-First National Bank, of Seattle, Washington, in trust nevertheless for the following uses and purposes:

"1. During the term of the trust hereby created the income and dividends arising from such shares of stock shall be by my trustees assigned and distributed as follows, to-wit:

"a. The dividends and income arising from thirty-six hundred shares of such stock shall be paid to employees of C. C. Belknap Glass Company as follows:

[Then follow the names of seventeen employees, among whom are the fourteen appellants.]

648

"At any time prior to the termination of the trust hereby created the executor or trustees or trustee shall have power in his or their or its discretion to pay to new employees after two years of satisfactory service to the company the dividends and income arising from all or any part of the remaining 400 shares of the capital stock of C. C. Belknap Glass Company, such dividends and income to be allocated among such new employees as the executor or the trustees or trustee shall then determine.

"b. The dividends and income arising from all of the remainder of the shares of stock and property held in trust shall be from time to time divided and distributed among all of the employees of C. C. Belknap Glass Company at the time of such distribution as a recognition of meritorious and efficient service to the company, including those employees of the company who are mentioned in subdivision 'a' above, in such ratios and amounts from time to time as shall be determined by the board of trustees of C. C. Belknap Glass Company and approved by the trustees under this will. All distributions of dividends under subdivision 'a' and 'b' shall be in addition to the regular salaries received respectively by such employees." (Italics ours.)

Subdivision "c" provides that, in case any employee mentioned in subdivision "a" shall resign or be discharged, he or they, as the case may be, shall forfeit all right to receive any of the income or dividends provided in subdivision "a", and, in such case such dividends shall be added to the amounts to be distributed under subdivision "b".

Subdivision "d" provides that, in case any of the employees mentioned in subdivision "a" shall die while in the service of the company, leaving a widow, one-half of the provision made for such employee shall be paid to the widow, so long as she shall remain unmarried, or until the termination of the trust.

Subdivision "e" provides that nothing in the will shall be construed as imposing a duty upon the trustees to distribute to employees of the Glass Co. any greater amount than the board of trustees and the trustees under the will shall deem to be reasonably available, taking into consideration the business needs of the company from time to time. The trustees were authorized to at all times retain in their hands such part of the dividends and income as in their judgment was reasonably required to meet the expenses of administering the trust and to provide for emergencies.

Subdivision 3 of paragraph 23 provides that the trust shall continue for fifteen years, unless terminated as provided in the will. Authority is given to the trustees to hire agents, servants, and other employees, to hire and employ such attorneys, counsel, and legal assistance as to the trustees shall seem necessary; to pay to themselves for their services as such trustees such sums as shall reasonably compensate them for their services as such trustees, in accordance with the scale of charges for service of like character established by general custom in Seattle.

Subdivision 4 of paragraph 23 provides that, in case of the death of Walter A. McClure, William E. McClure shall be appointed as cotrustee with the Seattle-First National Bank.

Subdivision 5 of paragraph 23 provides that, at the date fixed for the termination of the trust, or as soon thereafter as the same can be accomplished, the trustees shall sell all the shares of stock of the Glass Co. held by them in trust, or in case it shall appear to the trustees that such sale cannot be had at a reasonable price, then the trustees shall cause the Glass Co. to be dissolved and liquidated; or, in case at any time prior to the date fixed for termination of the trust, the market value of the stock of the Glass Co. shall have decreased

to seventy-five per cent or less of its actual value at the time of the testator's death, the trust may, in the trustees' discretion, be terminated and the capital stock sold, or the company dissolved and liquidated; or, at any time prior to the date fixed for termination of the trust, *the superior court for King county* may, in its discretion, *for any reason* terminate the trust, and thereupon the capital stock shall be sold and the company dissolved and liquidated. All of the proceeds arising from the sale of such stock, if the same shall be sold, or coming into the trust estate by reason of the liquidation of the company, in case the company shall be dissolved and liquidated, shall be assigned and distributed to the individuals who at the time of the termination of the trust *shall be receiving dividends under subdivisions "a" and "b" of the will,* in the proportion which at the time of termination of the trust shall be specified, in the manner provided, for the distribution of dividends.

No dividends or income from the capital stock of the Glass Co. was ever paid to any beneficiary under the will during the administration of the estate.

We think it is apparent that appellants, under paragraph 23-1-a, were only residuary legatees. The will does not provide that the stock itself should ever be devised to them. It is also apparent that some or all of them might never share in the proceeds received from a sale of the stock.

It is also established by the undisputed evidence in this case that neither Walter A. McClure nor the Seattle-First National Bank ever qualified or acted as trustees under the will. The acts of Mr. McClure were pursuant to the authority vested in him as executor.

On October 2, 1940, the court ordered the capital stock of the Glass Co. sold to C. M. Jennings, for ninety-five thousand dollars. On May 15, 1941, the

court entered an order approving the final account of Mr. McClure, as executor, and decreeing that the estate be distributed. This account showed cash on hand, $89,531.53. All specific cash bequests and all specific bequests of personal or real property were distributed to the persons named, without any deduction being made therefrom, or charge made thereon, for taxes or expenses of administration. The seventeen persons named in paragraph 23-1-a received from the estate, after the above specific bequests, legacies, taxes, and expenses of administration were paid, forty-five thousand dollars, prorated as set out in the decree, and those in subdivision "b" of paragraph 23 received $11,750. The decree adjusted the rights of all parties making claims under the will, and no appeal has been taken from the decree, except as herein indicated.

It should be kept in mind that there was no sale by the executor of four hundred shares of the capital stock of the Glass Co., but all the stock was ordered sold by the court.

We are of the opinion, as was the trial court, that when the entire will is read and considered, it is apparent that the primary intention of the testator was that certain specific bequests and legacies be paid and/or distributed, net; that is, without any deductions for taxes or expenses of administration; that the testator's just debts, funeral expenses, and expenses of last sickness be paid; and that the residue of his property be distributed among the employees designated in paragraph 23, who at the time of distribution were eligible to receive, under the will.

We think there can be no question but that, under our decisions, a testator may provide in his will that certain specific bequests and devises be made free and clear from any claim for taxes and expenses of administration. While the tax is figured on the specific

bequests or legacies, under a provision such as we have before us, it is paid from the residuary estate, at least where the estate is solvent.

*In re Henry's Estate,* 189 Wash. 510, 66 P. (2d) 350, we quoted from *In re Bowlin's Estate,* 189 Minn. 196, 248 N. W. 741, as follows:

"When a bequest like those made to the 40 beneficiaries first above mentioned is accompanied by a direction that inheritance taxes be paid out of the residue of the estate, it is in effect a bequest in the stated sum plus an amount sufficient to pay the tax properly chargeable to the entire bequest when so calculated. When the tax is computed upon the sum so arrived at and deducted therefrom, the remainder is the amount of the legacy which by the terms of the will is to be received by the legatee free from the tax."

In the *Henry* case, *supra,* we also quoted from *In re Levalley's Estate,* 191 Wis. 356, 210 N. W. 941, as follows:

"We cannot escape the conclusion that the right of the legatee to receive his legacy free from the tax gives him an interest in the estate over, above, and beyond the legacy which is a net amount of the gift really made to him and constitutes a transfer of an interest in the estate whether it consists of real, personal, or mixed property."

See, also, *In re Duryea's Estate,* 293 N. Y. S. 985.

 We are therefore of the opinion that the trial court properly distributed to Alice and Hattie Canfield the stock, specifically bequeathed to them, free and clear from any charge or deduction for taxes or expenses of administration.

We are also of the opinion that the trial court properly ordered distributed to the Canfield sisters, free and clear from any charge or deduction for taxes or expenses of administration, dividends on the stock so bequeathed, declared and received by the executor

subsequent to the death of Mr. Belknap. See 18 C. J. S. 1121.

The authorities cited by appellants to sustain their contention that, where the fund from which taxes and expenses of administration are to be paid fails, or is insufficient to pay them, then all the legatees must bear their prorata share of such taxes and expenses, are not applicable herein.

While it is true that we stated in the cases of *In re Corbin's Estate,* 107 Wash. 424, 181 Pac. 910, 7 A. L. R. 685, and *In re Ferguson's Estate,* 113 Wash. 598, 194 Pac. 771, 13 A. L. R. 122, cited by appellants, that the court cannot compel one legatee to pay the inheritance tax due from another, this statement was made in connection with the contention by the tax commission that the graduated rates should be applied to the estate passing to certain legatees and devisees as a whole, while the executor contended that the graduated rates should be applied to each bequest or legacy as a separate entity. The question involved in the instant case was not before the court in the cited cases, and no provision was contained in the will in either of the cited cases, such as we have in the will before us.

We now come to the question of the fees allowed the executor for his services and the services of his attorney.

The conclusion of the trial court that twenty-five thousand dollars was a reasonable sum to be allowed the executor and his attorney was based upon the testimony of Walter A. McClure, the records and files in the case, and the testimony of Messrs. O. B. Thorgrimson and A. J. Schweppe, the two last named gentlemen testifying as to the reasonable value of the services performed by Mr. McClure and his attorney. Mr. Thorgrimson and Mr. Schweppe were in court and heard Mr. McClure testify, both Mr. Thorgrimson and

Mr. Schweppe testifying that they had examined the records and files in the Belknap estate. Mr. Thorgrimson was then asked what he would consider to be a reasonable fee to be allowed the executor and his attorney, and gave the following answer:

"Well, I have tried to analyze in this type of case what would be proper fees and came to this conclusion,—that the rate provided by the bar association rules for fees for counsel in ordinary probate matters, were certainly earned in this case. That would be four per cent roughly or a fee of a little over seventy-five hundred dollars for counsel. It is our experience in probate matters that executors are allowed ordinarily the same amount. Especially, in view of the fact the executor was a lawyer, necessarily his work was to some extent based upon his legal knowledge. I think seventy-five hundred dollars for his services. That would make fifteen thousand dollars. Then taking again what the testimony showed this morning,— from 1928 to 1938 there had been a loss of approximately nineteen hundred dollars a month in carrying on the business [of the Belknap Glass Co.] under,— with the former president, Mr. Belknap, who was getting seventy-five hundred dollars a year, to a gain of a considerable amount since that time, for the next two years, under Mr. McClure's direction, that for this additional compensation that a sum of five thousand dollars a year would be fair extra compensation. I have not added anything because of the trial of the two cases that were tried,—one in one day and the other three days. One or two other trials,—at least court appearances, leaving it roughly,—making my estimate of the fees for counsel and the executor a total of twenty-five thousand dollars."

Mr. Schweppe, who testified that thirty thousand dollars was a reasonable fee to be allowed the executor and his attorney, when asked to break down this sum, stated:

"I arrived at it in this manner: I have knowledge in the few probate services I rendered in the case, ap-

pearances in court, and schedule of counsel, that the four per cent applied to the gross appraised value of the estate, one hundred and ninety-one thousand dollars, for both executor and attorney was reasonable for their portion of the services, which is approximately fifteen thousand dollars. I added to that another fifteen thousand dollars, which I think,—for special services, the skill contributed to the administration of this estate through the management of the Belknap Glass Company. Now, the picture I have outlined, as developed in Exhibit '5' is this: [Exhibit 5 is an itemized account of the services performed by Mr. McClure and his attorney, in connection with the Belknap estate, and was filed by Mr. McClure in the estate prior to the hearing, as required by rule of court. This exhibit consists of some eighty pages, and as summarized shows: Property of estate, as per inventory and appraisement, $191,082.03; total cash accounted for in final report $162,726.37; claims filed and paid 29, $1,380.91; letters written 207; letters received 106; telephone calls 499; conferences outside of office 27; conferences in office 425; appearances in court 39; pleadings prepared and filed 51.] About eighteen years ago that company was worth over four hundred thousand dollars net. Commencing in 1928, it sustained losses running to twenty-five thousand dollars [a year] and I should say by 1938, when Mr. Belknap died, there was an impairment of the capital,— of the capital of the Belknap Glass Company to the extent, I think of two hundred forty thousand dollars. . . . The evidence furnished me was that the company was losing at the rate of two thousand dollars a month, twenty-four thousand dollars a year, and two hundred forty thousand from 1928. Anybody knows that by a comparison like that it is in a precarious condition, and through anybody who had the responsibility, executor or attorney, of making decisions that would bring that business from 1938, where it was losing at the rate specified into the year 1939 where it was gaining one thousand dollars a month, had shown unusual executive skill and taken unusual responsibility, for which he was entitled to be paid the regular salary which the executive received in charge of the

business during the ten years when the business was losing twenty-five thousand dollars a year."

Mr. Schweppe further stated:

"Nobody pays ninety-five thousand dollars for a business that is losing twenty-five thousand dollars a year. In other words, the result obtained,—ninety-five thousand dollars for the stock, I think has, no doubt, brought out the fact that somebody had the courage and skill and ability to make necessary executive decisions to convert a losing business into a paying one."

The testimony is undisputed that Mr. McClure, immediately after his appointment as executor, by virtue of holding legal title to all the capital stock of the Glass Co., made an investigation of the condition of the Glass Co., and came to the conclusion that, in order to make the company income-producing, and to make the stock of any value, changes would have to be made in the methods of operation. With this end in view, he caused a new board of directors to be elected, consisting of himself, his brother, William E. McClure, and C. M. Jennings. The latter was elected president and made general manager of the company, and Walter A. McClure became vice-president.

At the time of Mr. McClure's appointment, forty-five persons, three of them being pensioners, were on the company's payroll, at large yearly expense for salaries and wages, and the company was losing money each month. It was imperative that expenses be reduced. Mr. Jennings was instructed to reorganize the business so as to prevent further losses and to produce profits. The pensions were accordingly cut off; the art department was discontinued; seventeen persons, including appellants and excluding the three pensioners, were discharged, and the payroll was reduced accordingly. The vacancies caused by the discharge of employees

were not filled at all, or were filled by transferring to other employees the duties of those employees who had been discharged.

Beginning with the month of January, 1939, the company showed a profit of approximately one thousand dollars per month. The executor had the actual management of the business, directing its policies from the time of Mr. Belknap's death, October 27, 1938, until the capital stock was sold, October 14, 1940.

It is apparent from this record that trouble started for the executor as soon as he made a change in the directors and had a new manager put in charge of the company, and especially after the company had discharged the employees hereinbefore mentioned. These employees felt that they had certain rights in the business and to the stock of the Glass Co., and after their discharge, filed a petition in the probate proceedings, asking for a judicial determination of their rights under the will. As indicative of what the several petitioners thought their rights were under paragraph 23 of the will, the petitioners asked that the court order the holding of a fair and impartial secret poll or ballot of the employee-beneficiaries named in the will, for the purpose of establishing the wishes of such beneficiaries as to the continuance or dissolution of the trust. They also asked for an order terminating the trust, and for the liquidation or distribution of the corporation, or such other distribution of the trust estate to the beneficiaries as to the court should seem just and proper. They also asked that they be reinstated.

This petition came on for hearing before Judge Todd, and it is apparent that it was more than a formal hearing. The twenty-eight page memorandum opinion filed by Judge Todd indicates that there were important questions of law involved, relative to the inter-

pretation of the will. While Judge Todd held that the discharge of petitioners did not prohibit them from participating in the estate, he did hold that the corporation had the right to discharge them, that they were not entitled to reinstatement, and were not entitled to have a ballot on the question of whether the business should be continued. In other words, he held that the employee-beneficiaries, under paragraph 23 of the will, had no rights in so far as the operation of the company was concerned.

It further appears that, under the law, the state and Federal inheritance taxes had to be paid within fifteen months after Mr. Belknap's death. The executor had available money or equivalent of the value of only $7,462.03. The state was claiming an inheritance tax of $35,470.88, and the Federal government, $14,532.10. Mr. McClure, after a careful study of the situation, concluded the only way to procure money to pay those taxes and avoid the payment of interest and other charges was by reducing the par value of the capital stock. Accordingly, the corporation proceeded to reduce the par value of its capital stock from four hundred thousand dollars to one hundred thousand dollars, thus providing a surplus of $48,907.02. The company then gave to Mr. McClure $31,500 in cash; it borrowed $15,000 on its note, which was also given to Mr. McClure; and with additional money in his possession, the executor was able to pay the taxes amounting to $50,002.

This reduction in the par value of the capital stock was not made until a petition had been filed in the probate proceedings, a hearing had, and an order of the court obtained therefor. Before resorting to the method of reducing the capital stock, the executor attempted to have the taxes reduced, and to have the interest waived. In his efforts along this line, the

executor presented to the 1939 legislature a bill which would vest the superior court with power to excuse an estate from liability to pay interest on the state inheritance tax. This attempt failed. The executor also attempted to obtain from the commissioner of internal revenue an extension of time to pay the Federal tax, on the ground that the payment of the tax within the statutory time would impose undue hardship on the estate. This application was rejected by the commissioner.

It is apparent from this record that Mr. Seibert, who had been in the employ of the Glass Co. for many years, and was one of those who received special bequests, as well as being one of those named in paragraph 23 of the will, was dissatisfied with the changes made in the business, especially after he was relieved of the position of manager, and was thereafter continually, personally or through his attorneys, calling upon or telephoning to the executor. It appears that the old employees, especially after the change in management, created a situation in the company which made it difficult for the executor. This was apparent even at the time of the hearing on the petition before Judge Todd, for in his memorandum opinion he stated:

"The court suggests, in view of the unrest and turmoil that exists, as has been shown by the evidence, at this company now, that this estate be soon terminated, that the trust be sooner terminated than the period of fifteen years mentioned in the will.

"It may be that this decision will have a beneficial effect upon the morale of the remaining employees of the company, and it may be that this decision will clarify the matter so that as a business institution it may go ahead on an equal footing with its strong competitors in the city."

We quote further from this memorandum opinion, which was filed December 5, 1939:

"The court has gone out of its way, in view not alone of its affection for Mr. Walter McClure, but in view of the fact that some persons might criticize him, to assure anyone within the hearing of my voice, and as far as the record is concerned, that they have no criticism coming on Mr. Walter McClure as executor of this estate."

There was at least one other hearing resulting from a petition filed in the probate proceeding by Mr. Seibert, in which he sought to have set over to him five thousand dollars in cash, in lieu of the construction of a house on certain lots bequeathed to him by the will. The executor, contending that, under the will, which provides:

"I hereby authorize and direct the executor of this will to expend the sum of Five Thousand Dollars ($5,000.00) out of my estate in the improvement of such property by the construction of a residence and other improvements thereon,"

he was not authorized to do other than construct a residence on the property bequeathed to Mr. Seibert, contested this petition. After a hearing, the court ordered the payment to be made to Mr. Seibert.

There was also a suit started by a Mr. Druxman to cancel a sale of a lot made to him by the executor, and recover the money paid. This case was settled, after a hearing, by the executor paying Mr. Druxman $675 and retaking title to the property.

Judge Batchelor, who heard this matter, and who made the order here appealed from, gave an oral opinion, which was transcribed and is before us. Judge Batchelor, of course, saw and heard the witnesses testify. He was familiar with the record, and we desire to quote certain parts of his decision, as indicating his view of the question presented:

"I haven't any doubt, gentlemen, but what it is the duty of the court to carry out the primary intention

of the testator in this case, and that primary intention, as indicated before, was the payment of his debts, the cost of administration, certain specific legacies free from all taxes and expenses of administration, and then the balance of his property to be distributed among the employees designated in his will. In other words, section 23 is clearly a residuary bequest and not a specific bequest. . . .

"Now, the rule is also well settled in this state at least that where an executor performs services out of the line of regular administration, he is entitled to an allowance for such services in fixing his compensation. Now, it appears in this case that the executor, in addition to the usual duties of an executor, performed duties as manager of a going business, a going concern. And as I say, that was not a light job. That is not only shown by the evidence in this specific case but it is also shown by the history of similar concerns. . . .

"Now, I want to say it because of certain things said in argument that I am making an express finding concerning the way Mr. McClure handled the estate. I think Mr. McClure handled this estate ably, honestly and with tact and discretion. I am satisfied that a man of less ability or discretion or tact than he had would have been in very serious difficulties in this estate. I say it very frankly, he finds an estate, a going business, and they haven't the money to pay the inheritance tax that they have to pay immediately. The plan he worked out was a masterful one. I think he has handled this estate ably, and the sole question remaining is as to his compensation. It is suggested by the exceptors that his compensation should be limited to ten thousand dollars, that the allowances, some of them, that have already been made by the probate department should be returned. [The record shows that Judge Frater had twice, previous to the final hearing, made allowances to the executor and his attorney.]

"The only testimony as to the value of his services is the testimony of three eminent members of the bar of this state. It is the same situation that occurred in the case to which I referred previously, *Watson v. Home*

*Savings.* [The correct title of this case is *Watson v. Johnson,* 174 Wash. 12, 24 P. (2d) 592.] I forget the title of this case, but it was tried in this department,— *Watson v. Home Savings & Loan Association,* in which my decision was modified as to the amount of the attorney's fees where there was uncontradicted testimony by members of the bar, and the supreme court held, as I read the decision, that I was bound by that uncontradicted testimony."

The opinion then goes on to state that, irrespective of whether or not, as a legal question, the court is bound by the uncontradicted testimony of the expert witnesses, the court was of the opinion that twenty-five thousand dollars was a reasonable fee to be allowed the executor for his services and the services of his attorney, $7,500 in addition to what had already been paid.

It is and has been the contention of appellants that neither the executor nor his attorney performed any unusual services in connection with this estate.

We are unable to agree with this contention. We are of the opinion that the executor and his attorney not only rendered, in a skillful and efficient manner, the usual services that might be expected of an executor and his counsel in such an estate as this, in which many important and serious questions were presented, but that the executor also performed unusual and extraordinary services in the active management of the Glass Co. for a period of almost two years; that his services in connection with such management were such that the company was brought from a condition in which it was losing twenty-four thousand dollars a year, to where it was showing a profit of one thousand dollars a month. We are satisfied that this improved condition of the business very materially increased the sale value of the capital stock.

It might also be stated at this point that the testator undoubtedly, because of his long acquaintance and business association with Mr. McClure, and his faith in his honesty and integrity, in his will made no effort to fix any specific amount the executor should receive for his services, but provided that the executor should be paid for his services such sum as should be fixed and allowed by the superior court for King county. That court has fixed the fee.

■ We now come to the legal question involved. Appellants contend that it is the general rule that, when the executor is an attorney, his compensation as such is in full for his services, although he exercises professional skill for which he might have hired an attorney. *Noble v. Whitten,* 38 Wash. 262, 80 Pac. 451; *In re Parker's Estate,* 200 Cal. 132, 251 Pac. 907, 49 A. L. R. 1025.

We do not read the *Noble* case as holding that an administrator or executor, even though he may also be an attorney, may not, in a proper case, employ an attorney, but in the cited case the court held that, in that particular case, no attorney's fee should be allowed, because there was no necessity for the employment of counsel. At the time the cited case was decided, there was no express statutory provision authorizing an allowance for attorney's fees, but only the general provision that an executor or administrator should be allowed all necessary expenses in the care, management, and settlement of the estate. We think the cited case recognizes that, even under the general statute, in a proper case the administrator may employ counsel and will be entitled to be allowed his reasonable expenses for that purpose.

Rem. Rev. Stat., § 1528 [P. C. § 9790], provides that, where no compensation shall have been provided by will, the executor shall be allowed such compensation

as to the court shall seem just and reasonable, based on the services rendered, and the like compensation shall be allowed to administrators; and that, in all cases where it is necessary for such executor or administrator to employ an attorney, such attorney shall be allowed such compensation as to the court shall seem just and reasonable.

The question raised by appellants is discussed in the case of *Jones v. Peabody,* 182 Wash. 148, 45 P. (2d) 915, 100 A. L. R. 64, and a conclusion contrary to appellants' contention was reached. We stated in the cited case:

"It is next contended that the contract relied upon was void as against public policy. [The contract referred to was one entered into between Ira Bronson and Harriet L. Peabody, executrix of the estate of Charles E. Peabody, deceased, and the law firm of Bronson, Jones & Bronson.] The general rule, no doubt, is that, when a lawyer voluntarily becomes administrator or executor, although he exercises professional skill in the conduct of the estate, he does not thereby entitle himself to additional compensation. *Kuhn's Appeal,* 4 Wash. 534, 30 Pac. 643; *Noble v. Whitten,* 38 Wash. 262, 80 Pac. 451. The executor or the administrator of an estate, *even though he may be an attorney,* may employ another attorney to assist him in the settlement of an estate, provided that it is necessary, and the estate will be responsible for the compensation of such additional attorney. *In re Evans' Estate,* 138 Wash. 101, 244 Pac. 260. Where the executor or trustee personally performs services, in their nature properly chargeable as expenses of the estate and in which he could have employed another, there is no good reason why he should not receive compensation for such services when performed. *In re Cornett's Estate,* 102 Wash. 254, 173 Pac. 44; *Kenney Presbyterian Home v. State,* 174 Wash. 19, 24 P. (2d) 403.

"The authorities outside of this jurisdiction are in conflict upon this question, some courts of last resort holding that an executor or trustee who is an attorney

cannot recover for even necessary or extraordinary legal services rendered. Others, and they appear to be in the majority, hold that an attorney who is a trustee or executor, if he performs extraordinary services, legal in their nature, is entitled to compensation therefor. It is unnecessary to review these outside holdings, because this court, in the cases already cited, has substantially and in effect adopted the rule that an attorney, even though a trustee or executor, may recover for necessary or extraordinary legal services performed by him." (Italics ours.)

We are satisfied that the executor in the instant case was justified in employing counsel to assist him, and we are also satisfied that, under the facts, the executor, in the management of the Glass Co., performed necessary and extraordinary services in addition to those ordinarily required of an executor, and that he is entitled to the reasonable value of all such services, and is also entitled to be allowed reasonable compensation for the services of his attorney.

■ Appellants contend, however, that the fees allowed to the executor and his attorney were too large, and far beyond the value of the services rendered, citing the following cases as so indicating: *In re Johnston's Estate,* 107 Wash. 25, 181 Pac. 209; *In re Levy's Estate,* 125 Wash. 240, 215 Pac. 811; *In re Hart's Estate,* 156 Wash. 255, 286 Pac. 650; *In re Perry's Estate,* 168 Wash. 428, 12 P. (2d) 595; *In re Fetterman's Estate,* 183 Wash. 410, 48 P. (2d) 638.

In our opinion, other cases are not of much value in determining the compensation to be allowed an executor or administrator in a particular case, and we have many times so stated, as indicated by the following quotation from *In re Fetterman's Estate, supra:*

"With respect to allowances for services of personal representatives and attorneys, we have said that each case must stand upon its own footing, the general rule being that this court will not interfere with the trial

court's discretion nor disturb its findings unless there are facts and circumstances clearly showing an abuse of discretion. *In re Andrews' Estate,* 123 Wash. 546, 212 Pac. 1073; *In re Levy's Estate,* 125 Wash. 240, 215 Pac. 811; *In re Hart's Estate,* 156 Wash. 255, 286 Pac. 650."

Under this record, we think the trial court was justified in allowing a fee of fifteen thousand dollars to Mr. McClure and his attorney, for the usual services performed in connection with the administration of the estate, and we are also of the opinion that the trial court, in addition to the above amount, was justified in allowing to Mr. McClure, for necessary and extraordinary services performed in connection with the management of the Glass Co., an additional ten thousand dollars, or five thousand dollars a year.

The order appealed from is affirmed.

ROBINSON, C. J., BEALS, SIMPSON, and BLAKE, JJ., concur.