John B. COFFEE et al., Appellants,

v.

WILLIAM MARSH RICE UNIVERSITY et al., Appellees.

No. 14472.

Court of Civil Appeals of Texas.

Houston.

Oct. 27, 1966.

Rehearing Denied Nov. 17, 1966.

270 

Joe H. Reynolds, William Key Wilde, Wright Morrow, Houston, for appellants.

O. Don Chapoton, Alvin M. Owsley, Jr., Dillon Anderson, Tom M. Davis, Houston, Baker, Botts, Shepherd & Coates, Houston, of counsel, for appellees.

On Remand from Supreme Court

COLEMAN, Justice.

This is a suit brought by William Marsh Rice University, and the Trustees thereof, for the purpose of securing an interpretation of the organic instruments by which the institution was created that the Trustees, in the exercise of their discretion, are free to accept as students qualified applicants without regard to color and to charge tuition to those able to pay the same. In the alternative, the University requested the court to apply the equitable doctrines of Cy Pres and deviation if such action was found to be necessary in order that students might be admitted without regard to color and that tuition might be charged those able to pay the same.

After a trial before a jury the court entered a judgment granting the requested relief, and certain former students of the University, intervenors herein, have perfected an appeal to this Court.

By an instrument dated May 13, 1891, and acknowledged on May 16, 1891, William Marsh Rice gave to James A. Baker, Jr., E. Raphael, C. Lombardi, J. E. McAshan, F. A. Rice and A. S. Richardson, as Trustees, a promissory note in the sum of $200,-000.00 payable at his death. This instrument recited the terms of the note verbatim, and provided that the money donated should be an endowment fund, the interest, income, issues and profits of which should forever be donated "to the instruction of the white inhabitants of the City of Houston, and State of Texas, through and by the establishment and maintenance of a Public Library and Institute for the Advancement of Literature, Science and Art, to be in-

corporated as hereinafter provided, and to be known by such name as the said parties of the second part (Trustees) may in their judgment select."

This instrument then directed the Trustees to incorporate "forthwith for the purpose of carrying out the uses, intents, and purposes of this trust." The next paragraph provided:

"*THIRD*:—That as soon as the said Public Library and Institute for the Advancement of Science and Art shall have been incorporated, as herein contemplated, then the said *Institute*, through and by its Board of Trustees hereinafter named, shall accept from the said parties of the second part, the Endowment Fund of Two Hundred Thousand Dollars." (Emphasis added)

The instrument proceeded to appoint as Trustees of the Institute Willliam Marsh Rice and the same people who were Trustees under the trust indenture; provided life tenure; reserved to William Marsh Rice the right to fill vacancies arising during his lifetime; providing that all trustees be inhabitants of the City of Houston, Texas; reserving to William Marsh Rice, "during his natural life", the right to make all decisions in the event he disagreed with the other Trustees.

Numbered Paragraph SEVENTH reads:

"The Endowment Fund, herein mentioned, including all future endowments, donations and bequests that may hereafter be made to the said Institute, not otherwise provided, shall be devoted to the following objects, and purposes, to-wit:

"A. To the establishment and Maintenance of a Free Library, Reading Room, and Institute for the Advancement of Science and Art.

"B. To provide, as soon as the fund will warrant such an expenditure, for the establishment and maintenance of a thorough polytechnic school, for males and females, designed to give instructions on the application of Science and Art to the

useful occupation of life; the requirements for admission to which shall be left to the discretion of the Board of Trustees.

"C. Said Library, Reading Room, Scientific Departments, and Polytechnic School, and the instruction, benefits and enjoyments to be derived from the Institute to be free and open to all; to be non-sectarian and non-partisan, and subject to such restrictions only, as in the judgment of the Board of Trustees will conduce to the good order and honor of the said Institute."

The Trustees were expressly forbidden "ever to permit any lien, encumbrance, debt or mortgage to be placed upon any of the property, or funds, belonging now, or that may hereafter belong to said Institute; * * *"

They were given "full authority" to formulate and enforce such by-laws, rules and regulations, for the government of the affairs of said Institute as in their judgment they may deem proper.

The last paragraph reads:

"THIRTEENTH:—It is expressly provided that one-tenth of the increase of the Endowment Fund, herein mentioned, shall be set apart as a Sinking Fund, which may be used in the discretion of the Board of Trustees for betterments and improvements of the Institute."

On the 18th day of May, 1891, the charter of the Institute was signed and acknowledged by all of the Trustees except William Marsh Rice. The trust instrument was quoted verbatim in the charter. There was evidence that both the trust instrument and the charter were prepared by E. Raphael, who was not then practicing law. At that time William Marsh Rice resided in New York, although he had previously lived in Texas for a number of years.

■ Since the trust indenture and the corporate charter were prepared by E. Raphael at the direction of William Marsh Rice at about the same time and each refer to the other, the instruments must be construed together. 90 C.J.S. Trusts, § 164.

The name of the corporation, established by the charter, was the William M. Rice Institute for the Advancement of Literature, Sience and Art.

Article Two (2) of the Corporate Charter reads:

"The objects, intents, and purposes of this Institution' are declared to be the establishment and maintenance, in the City of Houston, Texas, of a Public Library, and the maintenance of an Institute for the Advancement of Literature, Science, Art, Philosophy and Letters; the establishment and maintenance of a Polytechnic school; for procuring and maintaining scientific collections; collections of chemical and philosophical apparatus, mechanical and artistic models, drawings, pictures and statues; and for cultivating other means of instruction for the white inhabitants of the City of Houston, and State of Texas, to, for, and upon the uses, intents, and purposes, and upon the trusts, and subject to the conditions and restrictions contained in a deed which is in form, substance and words as follows * * *."

After quoting the trust instrument the charter provided that the "office" of the Institute shall be established and remain in the City of Houston, Texas. It provided for a board of seven trustees, naming them, and provided that the "corporation powers of this Institute" shall be managed and exercised by them. The charter then in general terms granted the corporation power "to execute the trusts and powers mentioned in and intended to be created by" the trust indenture quoted, and to hold the endowment with the increase and profits thereof, "including all endowments, donations, and bequests at any time to be made to the said Institute, subject to the conditions and restrictions created in said deed, and to, for and upon the uses, intents, and purposes expressed and provided." The

corporation, "and the Board of Trustees thereof", were authorized "to do and perform all and every act and thing whatever, and to carry out and accomplish all and every trust, intent and purpose provided to be done, carried out or accomplished, in and by the aforesaid deed * * * and * * * to receive all and every endowment, donation and bequest made to it, and to appropriate the same to the uses, intents, and purposes contemplated herein and in said deed."

Article EIGHT (8) provides: "The said Institute has no capital stock."

William Marsh Rice died in 1900. His will was not admitted into evidence, however it was stipulated that by its terms the residue of his estate passed to Rice Institute, and that in the will he stated it as his desire that his nephew, William Marsh Rice, Jr., be elected to the Board of Directors of William Marsh Rice Institute and stated his hope that he would take an interest in the prosperity and success of the Institute. He also stated in his will his desire that E. Raphael should act in the capacity of secretary of the Institute as long as he wished to and felt an interest in the success of the purpose for which said Institute was formed.

At the time of the trial of this case none of the original Trustees were living and no letters could be produced written by Mr. William Marsh Rice concerning his plans for Rice Institute. During the years after the corporation was formed before the death of William Marsh Rice, there were no buildings and no functioning institution. The minutes of the Board of Trustees show some twelve meetings during this period, two of which were attended by William Marsh Rice. These minutes reflect that he wrote letters and sent telegrams to the Trustees for the purpose of conducting the business of the Institute, but none of them were found.

Our task in this case is not unlike that of the court in William Buchanan Foundation v. Shepperd, Tex.Civ.App.1955, 283

S.W.2d 325, reversed and remanded by agreement 155 Tex. 406, 289 S.W.2d 553, where the court summarized the general rules of construction by which we must be guided:

"The cardinal principle to be observed in construing a trust instrument is to ascertain the settlor's intent with the view of effectuating it. 42 Tex.Jur. 621–622, Trusts, Sec. 19; Parrish v. Mills, 101 Tex. 276, 106 S.W. 882; 65 C.J. 497–498, Trusts, Sec. 241; 90 C.J.S. Trusts § 162.

"Also it is the intention of the settlor at the time of the creation of the trust that is determinative. Restatement, Trusts, 16, 17, Sec. 4.

"The rules of construction for deeds, wills and other instruments are also applicable for the construction of trust instruments. 42 Tex.Jur., 621–622, Trusts, Sec. 19. In Pugh v. Mays, 60 Tex. 191, 192, it is stated: 'The general rule for construing deeds is that announced in Hancock v. Butler, 21 Tex. 804, as elementary, and applicable alike to written instruments generally, and that is, every part of a deed should be harmonized and given effect to, if this can be done; but if it is found that there is in the instrument inherent conflict of intention, *then the main intention, the object of the grant being considered, shall have controlling influence.*' (Emphasis added.)

"It is elementary that if a written instrument is unambiguous the construction of it is for the court to determine from the terms of the instrument itself.

"Parol or extrinsic evidence may be admitted to aid in construing a trust instrument only if the instrument is ambiguous or uncertain, and only to explain and not to contradict, the instrument, but also on the other hand, in case of doubt or ambiguity, parol, extraneous, or extrinsic evidence may be considered in order to ascertain the settlor's intention, and may be proper in order to illuminate the circumstances surrounding the execution of the instrument and the settlor's conception or understand-

ing of any ambiguous words employed by him therein. 90 C.J.S. Trusts, § 165a. Also where the trust instrument is indefinite, ambiguous, uncertain or inconsistent, the court can, or must, consider the surrounding circumstances in determining just what the intention of the donor was, or the meaning of the instrument. 90 C.J.S. Trusts, § 165b."

In Cutrer v. Cutrer, 162 Tex. 166, 345 S.W.2d 513, 86 A.L.R.2d 105, the Supreme Court pointed out that in interpreting a trust instrument the court must seek the intention of the maker as it existed at the time the trust was created, and stated:

"Where as here the court is concerned with the construction of a written instrument and the right to reformation, rescission or other equitable relief is not in issue, the intention of the parties must be determined from the language of the instrument and the circumstances surrounding its execution. Utterances of the parties tending to show their association of words and external objects may be considered as part of the surrounding circumstances, but statements of subjective intent or will dealing with the subject of the specific document are ordinarily not admissible."

In the second edition of the Restatement of Trusts, § 164, it is stated that the nature and extent of the duties and powers of the trustee are determined by the terms of the trust, meaning the manifestation of intention of the settlor with respect to the trust expressed in a manner which admits of its proof in judicial proceedings. "The intention of the settlor which determines the terms of the trust is his intention at the time of the creation of the trust and not his subsequent intention." Comment b, Restatement of the Law of Trusts, 2d, § 164. "If a trust is created by a transaction inter vivos and is evidenced by a written instrument, the terms of the trust are determined by the provisions of the instrument as interpreted in the light of all the circumstances and such other evidence of the intention of the settlor with respect to the

trust as is not inadmissible because of the Statute of Frauds, the parol evidence rule, or some other rule of law." Ibid., Comment e.

The Trustees alleged that it has become impractical to carry out all of the conditions and directions contained in the trust instruments, and that in order for them to carry out the dominant intention of the donor it is necessary that they be freed from certain of these restrictions. This requires a construction of these instruments and it is our duty to consider all of the provisions of the instruments. The purpose or purposes gathered from the instruments in their entirety, rather than from isolated portions thereof, must be given controlling effect. Adams v. Adams, 1941, 147 Fla. 267, 2 So.2d 855; Williams v. Morris, 1933, 144 Or. 620, 25 P.2d 135; Shade v. Colgate, 1949, 4 N.J.Super. 356, 67 A.2d 193; 90 C.J.S. Trusts, § 162.

It is clear from the wording of the instruments, without the aid of parol evidence, that the motivating force leading to the creation of the trust was the desire of the donor to contribute to the "instruction of the white inhabitants of the City of Houston, and the State of Texas." From a consideration of the instruments as a whole we are impelled to disagree with the contention of appellants that the quoted phrase must be considered the dominant purpose of the trust.

While the trust instrument at one place stated that the income from the endowment fund should be donated "to the instruction of the white inhabitants of the City of Houston, and State of Texas, through and by the establishment and maintenance of a Public Library and Institute for the advancement of Literature, Science and Art," the phrase is not repeated in paragraph seven, previously quoted. There it is stated that the endowment fund shall be devoted to "the following objects and purposes * * *" Then, after specific methods of gaining and disseminating knowledge are specified, it is provided that the Library,

Reading Room, Scientific Departments and Polytechnic School, and "the instruction, benefits and enjoyments to be derived from the Institute to be free and open to all * * * and subject to such restrictions only, as * * * will conduce to the good order and honor of the said Institute."

It should be noted that a question arises, from this language, as to whether the library, scientific departments and polytechnic school are considered integral parts of the Institute, or whether they are to be considered as separate projects to be supported by the Institute from the endowment committed to its care. Is the Institute to be "free and open to all," or is it the "instruction, benefits, and enjoyments" to be derived from the Institute that are to be free and open to all? The Institute is variously described as one for the advancement of Science and Art, or for the advancement of Literature, Science and Art, or for the advancement of Literature, Science, Art, Philosophy and Letters. That these phrases are descriptive of the purpose of the institution, rather than merely a reference name, is clear from a consideration of the writings in their entirety.

While the motivating factor leading to the establishment of the trust was the donor's desire to promote the education of the white inhabitants of the City of Houston, and State of Texas, the dominant purpose of the trust was to establish a free library and an educational institution, the primary aim of which was to contribute to the advancement of human knowledge in the fields of literature, science, art, philosophy and letters. Subsidiary purposes were to be the establishment and maintenance of a polytechnic school, scientific collections, and collections of chemical and philosophical apparatus, mechanical and artistic models, drawings, pictures, and statues, as well as such other means of more directly instructing the white inhabitants of Houston and Texas, as the Trustees might devise.

The institute was repeatedly mentioned in the trust instrument and the corporate charter. The name given the corporation is revealing. The Institute was to be incorporated and the endowment fund was to be managed by the Trustees of the corporation. After provision is made for the establishment and maintenance of the Library and Institute, the Polytechnic School is to be established. A sinking fund was provided for "betterments and improvements" of the Institute. The office of the Institute is to remain in Houston. It must also be noted that the word "Institute" is used in the charter to refer to the corporation. Nevertheless, it is our opinion from a consideration of all provisions of the instruments that the dominant purpose of the donor was to create an educational institution primarily devoted to research and original work calculated to expand the boundaries of human knowledge, the benefits of which would accrue only indirectly to the white inhabitants of Houston and Texas. By reason of the subsidiary purposes and the authority to provide "other means of instruction" the Trustees were given great discretion in formulating the vehicle by which the purposes of the donor were to be accomplished. It should also be noted that the polytechnic school, museums, and "other means of instruction," with the exception of the Library, probably were intended to be functioning components of the Institute, since they were to be established, financed, and managed by the corporation, and the sinking fund was to be established for improvements and betterments of the Institute.

Judicial notice may be taken of the fact that in 1891, when the trust instrument was signed, the University of Texas had been in operation only eight years, and that the number of students attending institutions of higher learning in Texas was small. At that time the opportunities for free education at the college level were limited. The amount of research and creative work being carried out in science and the liberal arts

could not have been significant. The number of people qualified by education to do such work was undoubtedly small. The need for such an institution in this State was apparent.

Webster's International Dictionary, 2nd Edition, defines the word "institute" as: "an institution; an organization for the promotion of learning, philosophy, art, science, or the like, as a society, academy, college, technical school, * * *" It defines "university" as: "an institution organized for teaching and study in the higher branches of learning, and empowered to confer degrees in special departments, as theology, law, medicine, and the arts, * * * In the United States a university typically comprises a college and one or more graduate or professional schools; but the term is sometimes loosely used."

While the word "university" does not appear in the trust instrument or the charter, it seems clear that an "Institute for the Advancement of Literature, Science and Art" might well be a university. Clearly the Trustees of the corporation were empowered by the donor with the authority to make of the Institute a university of the first class so long as the general purposes and intents disclosed in the trust instrument were accomplished.

In 14 C.J.S. Charities § 47, p. 500 et seq., this statement is found:

"In general, the property or funds forming the subject matter of a charity should be applied to the purposes, and for the benefit of the persons or institutions, and in the mode or manner, indicated by the founder; but, where a particular application or mode of administration is not prohibited by the instrument creating the trust, or may be deemed by construction to be within its terms, it may be adopted in order fully and properly to execute the trust and to effectuate the intent of the donor or testator. Sometimes a provision, in the instrument creating the trust, as to a particular application of the funds is considered merely directory; and the donor may legally give the trustees wide discretion as to the management of the trust, and a power to decide on the best means to employ for carrying out the charitable purpose is sometimes given by implication."

Among the authorities cited in support of the text are: Harter v. Johnson, 1922, 122 S.C. 96, 115 S.E. 217; In re Graham's Estate, 1923, 63 Cal.App. 41, 218 P. 84; and In re Stark's Will, 1931, 149 Wis. 631, 234 N.W. 750, where the Court said:

"The real question presented here is whether or not the testator's purpose to establish a children's hospital should be defeated because it cannot be carried out as he no doubt thought twenty-five years ago it would be, or whether having regard to present conditions, his intentions should be effectuated in a manner slightly different than any which may have been contemplated by him at the time of his death. Mr. Stark was quite evidently not only a highly intelligent man, but was possessed of unusual foresight and acumen. He necessarily therefore left much to the discretion of his trustees. The building of a unit small enough to be maintained as a separate organization having its own heating plant, servants' quarters, etc., would be so inadequate as to be almost futile. The plan now suggested by the corporation gives much greater effect to the testamentary wishes of Mr. Stark than a plan which would attempt to embody the ideas which he may have had in his lifetime. The realization that some such situation might exist is no doubt one of the things which prompted him to give such broad discretionary power to the trustee."

In Bogert, Trusts & Trustees, 2nd Ed., Ch. 20, Charitable Trusts, § 393, p. 224, we find the statement: "However, if the trustee is not bound by instructions as to a plan of operation which have been given by the settlor or a court, he may choose a method which is reasonably adapted to bring about the achievement of the purposes of the charity."

The case of Samuel and Jessie Kenney Presbyterian Home v. State, 1933, 174 Wash. 19, 24 P.2d 403, involved a question very similar to one of the questions with which we are concerned. There the donor left her residuary estate to trustees for the purpose of establishing a home for aged people. The first numbered paragraph of her will reads:

" '1st. Except as hereinafter otherwise limited they shall take, receive, collect, hold, manage, invest, re-invest, dispose of, convey, deed, and accumulate, the same and the rents, issues, profits and increase thereof as they and their successors shall deem for the best interests of the trusts in this item created and defined, and as soon as practicable after my decease, shall found and thenceforth forever maintain therewith or with the same and other donations and accessions and accumulations in aid thereof, in the City of Seattle, and State of Washington, or in the vicinity of said City, a home or retreat for such infirm persons of both sexes of above sixty (60) years of age, as they or their successors in such trust shall from time to time approve and appoint, who by reason of poverty are, in the judgment of said trustees or their successors, unable to adequately provide for themselves, and where such persons, irrespective of their religious or political views, shall be gratuitously supplied as far as may reasonably be, with the shelter, care and comforts of a home, which home or retreat shall be called and known as The Samuel and Jessie Kenney Presbyterian Home and shall be subject to such reasonable rules and regulations for the conduct and government thereof as said trustees and their successors shall from time to time prescribe."

It was contended that the trustees had no power to charge and collect fees from the residents of the home or to render them services for compensation or otherwise than gratuitously. Relying largely on the case of President, etc., German Aged People's Home v. Hammerbacker, 64 Md. 595, 3 A.

678, 54 Am.Rep. 782, and Zollman on Charities, the Court said:

"We are clear that Mrs. Kenney delegated to the trustees discretion in the matter of selection of members for the home. We are also clear that the trustees had the right to receive from the members, or their friends or relatives, any contributions of money or property to be used in aid of their support and maintenance in the home. We find no authorities to the contrary."

In this opinion there are quotations from the authorities mentioned above which, we think, explain the position taken by the Trustees of Rice University. For example, we find these quotations from Zollman on Charities:

"It is neither usual nor desirable to confine the administration of a hospital exclusively to the indigent. An institution which is in its nature a public charity does not lose such character though an income is received from its beneficiaries. It is none the less a charity because it is discriminating. "Furnishing board, lodging and nursing to needy persons is among the most familiar and useful of charities, and that which constitutes such an institution a charity is that it does not furnish these things for profit.' An institution from which the rich are not turned away because of their wealth, nor the poor because of their poverty is, therefore, a public charity, so long as payments received from patients or other beneficiaries are devoted to the general purposes of the charity and not to the private benefit of individuals or corporations. 'By this operation, the funds of the institution are not absorbed, but augmented; the charitable object of the asylum is not diminished, but promoted; and the nature of it is not changed but pursued.' The partial payment by students of the cost of educating them 'makes it possible to extend the benefits of the University to a larger body of men and women in search of education than would otherwise be the case, and so long as such contributions are not unreasonable and are not in such an amount

that it could be said that the benevolence in the foundation is no longer substantially reflected in the benefits which it confers, then the institution is still charitable.' Charity, therefore, has a significance broad enough to include practical enterprises for the good of humanity operated at a moderate cost to those who receive the benefit. 'Reason and authority are opposed to the proposition that an institution otherwise charitable will be deprived of that character by the mere fact that charges for facilities and services are made to individual members, which not only do not result in profit, but which fail, in the aggregate, even to make the institution self-sustaining.'

" * * *

Payments by Beneficiaries. Advantages. Such payments result in other advantages. 'The fact that paying patients are taken, the profits derived from attendance upon these patients being exclusively devoted to the maintenance of the charity, seems rather to enhance the usefulness of the institution to the poor; for it is a matter of common observation amongst those who have gone about at all amongst the suffering classes, that the deserving poor can with difficulty be persuaded to enter an asylum of any kind confined to the reception of objects of charity; and that their honest pride is much less wounded by being placed in an institution in which paying patients are also received."

We point out for emphasis that there is no provision in the trust instrument or corporate charter that expressly excludes negroes and other non-white peoples from sharing the "instruction, benefits, and enjoyments to be derived from the Institute," nor do those instruments declare that the "instruction" should be confined to the white inhabitants of Houston and Texas *solely*. On the contrary, in paragraph seven it is directed that the "instruction, benefits and enjoyments *derived* from the Institute" were to be free and *open to all,*

to be non-sectarian and non-partisan, and *subject to such restrictions only* as in the *judgment of the Board of Trustees* will conduce to the *good order* and *honor* of the Institute.

The Trustees were further given "full authority" to formulate such rules and regulations for the government of the *affairs* of the Institute *as in their judgment* they may deem proper.

Certain stipulations were made by the parties to this cause, subject to objections as to relevancy and materiality, including the following:

### III.

"Dr. Edgar Odell Lovett was selected by the Trustees in 1907 to be the first President of Rice Institute. He served in that capacity until 1946 when he was succeeded by Dr. Houston. Dr. Lovett, who is now dead, in the Book of the Opening, Volume 1, Pages 142–143, made the following statement:

" 'Accordingly, and in the spirit of the founder's dedication of the Institute, it was proposed that the new institution should enter upon a university programme, beginning at the science end. As regards the letters end of the threefold dedication, it was proposed to characterize the institution as one both of liberal and of technical learning, and to realize the larger characterization as rapidly as circumstances might permit. With respect to the art end, it was proposed to take architecture seriously in the preparation of all of its plans, and to see to it that the physical setting of the Institute be one of great beauty, as well as of more immediate utility. This in a nutshell is the programme on which we have thought with great deliberation and wrought with even greater care. Its chronology to date consists of one year of preparatory study from England to Japan, one year in the making of preliminary plans, and two years in work of actual construction and organization.

" 'The new institution thus aspires to university standing of the highest grade, and would achieve its earliest claims to this distinction in those regions of inquiry and investigation where the methods of modern science are more directly applicable * * *'

## IV.

"During the school year of 1914–15, Rice Institute has a 'teaching staff of some thirty members, a shall group of graduate students in mathematics, physics and biology; and a self-governed democratic undergraduate body of freshmen, sophomores, and juniors, of more than two hundred and fifty members, from some seventy-five towns in Texas and fifteen States of the Union.' (Book of the Opening, Volume 1, Page 187.)

## VII.

"Since 1912, the growth and development of Houston and the State of Texas have been rapid, paralleling the transformation of the United States from a predominantly agricultural nation into the largest single political, economic and industrial complex in the Western world.

## VIII.

"Since 1912, there have been substantial advances in fields of science and engineering which were not known in 1891; and the cost of providing the physical and educational facilities of a university has increased substantially between 1891 and the present time.

## IX.

"Since 1891, there have been changes in habits, customs, laws and economic conditions of this State and nation.

## X.

"Since the establishment of Rice University, so far as the admission officers know, no Negro has been admitted, as a register-

ed student. There have been a number of orientals and other members of the brown and yellow races admitted as students to both the undergraduate and graduate schools at Rice University."

It was stipulated that there was no issue as to the Trustees failing to carry out the terms of the indenture in establishing a public library, and that the Board of Directors at all times since the beginning of Rice Institute have faithfully and diligently sought out and employed the best talent available for the staff in the operation of the Rice Institute or Rice University, and they have diligently and faithfully handled all of the other affairs with reference to the buildings and maintenance of said Institute to the best of their ability, and that they have faithfully performed their duties in that respect at all times.

A letter from J. E. McAshan, an original Trustee, is in evidence in which he states that when William Marsh Rice requested him to become a Trustee he expressed his intention to create a "great" institution, and that he would undertake the erection of the Insitute himself were it not that he thought it would be a source of worry to him and that he preferred to leave the details to younger men such as he had named as Trustees.

A letter from W. H. Leavell reporting a conversation with William Marsh Rice throws some light on his intentions. It states that Rice "dwelt much upon his notion to provide the opportunity to less fortunate youths of the State for some definite equipment for life," and that in answer to a suggestion that it might be wise to "put the thing on its feet during his lifetime," he stated that "he was an old man and did not care to be burdened with that, and that he was not familiar with the details of such organization, and that he had arranged the matter in his judgment more wisely *by putting his notions in shape in a general way* and committing the further carrying-of-them-out to the hands of a

wise Board of which Capt. Baker was the head."

A letter written by Captain Baker to Dr. Lovett in 1907 urging him to become the "educational head of the William Marsh Rice Institute," while admitted only as a bill of exception, was an ancient document produced from the archives of Rice University and indicates that some years after the death of Mr. Rice no definite plans had been made to carry out his purposes. The letter states:

" * * * The Trustees have proceeded quite deliberately in making a selection of an educational head, and purposely so, because they realized that there was no more important step for them to take in the inception of the enterprise than to get a proper man to take the lead and blaze the way * * *

"Our institution is well endowed—more so than any institution I know of in the South; the Trustees are practically without any experience in educational matters and they will be disposed to give you a very free hand. As a rule they are broad minded and liberal, and desire in establishing the new institution to lay its foundations broad and deep, * * * "

A brochure issued by the Trustees prior to the opening of scholastic work reads, in part:

"The Rice Institute of Liberal and Technical Learning. Founded in the City of Houston, Texas, by William Marsh Rice, and dedicated by him to the Advancement of Letters, Science and Art.

* * * * * *

"For the present it is proposed to assign no upper limit to the educational endeavor of the new institution, and to place its lower limit no lower than the standard entrance requirements of the more conservative universities of the country. * * * It is also proposed that a group of selected graduate students be afforded opportunities for study and research."

The calendar for the first academic year contained this statement:

"The new institution bears the name of the founder, the late William Marsh Rice. It aspires to university dimensions of the highest standing. Dedicated to the advancement of literature, science, and art, the educational programme of liberal and technical learning now being developed may justify the designation 'Institute' as representing the functions of a teaching university and, at least in some of its departments, those of the more recent research foundations established in this country and abroad."

Excerpts from a Book of the Opening found in the archives of Rice University were introduced. Portions of speeches delivered by Dr. Lovett during ceremonies commemorating the opening of Rice Institute, attended by several members of the original Board of Trustees, and published by authority of the Board, are revealing not only as to the interpretation placed on the trust instrument by the Board of Trustees, but also the kind of institution envisioned by them. These statements are significant:

"To his trustees, a self-perpetuating board of seven life members, the founder gave great freedom in the interpretation of his programme and corresponding discretion in the execution of its plans. The charter and testament under which these gentlemen discharge the obligations of their trusteeship are documents so liberal and comprehensive as to leave the institution under practically but one restriction, namely, its location must be in Houston, Texas."

"It is now rather more than twenty years since several public-spirited citizens of the community asked Mr. Rice to bear the expense of building a new public high school for the city of Houston. This direct gift to the city's welfare Mr. Rice was unwilling to make, but a few months later, taking into his confidence a half-dozen friends, he made known to them his desire to found a

much larger educational enterprise for the permanent benefit of the city and State of his adoption. These gentlemen were organized into a Board of Trustees for the new foundation, which was incorporated in 1891 under a broad charter granting the trustees large freedom in the future organization of a non-political and non-sectarian institution to be dedicated to the advancement of letters, science, and art."

"Another early decision of the trustees of the Institute was the determination that the new institution should be housed in noble architecture worthy of the founder's high aims; and upon this idea they entered with no lower ambition than to establish on the campus of the Institute a group of buildings conspicuous alike for their beauty and for their utility, which should stand not only as a worthy monument to the founder's philanthropy, but also as a distinct contribution to the architecture of our country."

"Among the additional buildings for which tentative studies have already been made are special laboratories for instruction and investigation in physics, chemistry, and biology."

"In the third place, the very problems pressing for resolution in the development of the environment seemed to call for a school of science, pure and applied, of the highest grade, looking, in its educational programme, quite as much to investigation as to instruction.

"For these facilities the best available instructors and investigators are being sought wherever they may be found, in the hope of assembling a group of unusually able scientists and scholars through whose productive work the Institute should speedily take a place of considerable importance among established institutions."

" * * *—we propose to say that in the year following only the best thousand among the applicants for admission, whether old or new, shall be received, and to persevere in this process of selection year by year for another score of years."

"In an earlier section of this address I have sketched in broad lines the scope of the new university's work and the range of its studies. I have implied our belief that the college and the professional school thrive best in a university atmosphere. I have also said that this university programme with us is to have no upper limit, and that its lower limit is to be no lower than that of the more conservative colleges and universities of the country; that is to say, the Rice Institute's programme will include within its schedules of studies no courses of grade lower than collegiate grade. The opportunity to found a great secondary school, as was the opportunity to devote the entire resources of the foundation to a single professional school, was tempting and equally promising. Neither of these courses, however, would have kept full faith with the will of the founder as expressed in the charter and testament, * * *"

"Furthermore, for the degrees of master of arts, doctor of philosophy, and doctor of engineering every facility will be afforded properly qualified graduate students to undertake lines of study and research under the direction of the Institute's resident and visiting professors. Thus it appears that Rice would interpret in a very large way its dedication to the advancement of letters, science, and art. It would look not only to the employment of these principles in the development of the life of the individual and in that of the race, but it would also play its part in the progress and enlargement of human knowledge by the contribution of its own resident professors and scholars."

"From the preceding systematic schemes for academic and scientific work, it would appear that the Rice Institute aspires to university standing of the highest grade as an institution of liberal and technical learning, dedicated to the advancement of letters, science, and art, by instruction and by

investigation, in the individual and in the race, its opportunities for study and research being open, without tuition and without fees, both to young men and to young women."

It is clear, from the terms of the trust instruments, that the primary intention of the settlor was to establish an educational institution for the advancement of literature, art, and science. An institution devoted to the advancement of human knowledge in those fields must necessarily be an institution of the first class. The institution must be one capable of attracting the most able scholars who alone are capable of carrying on creative projects, of making significant contributions to literature and art, and of conducting the research necessary to expand human knowledge in the fields of science. It is a matter of common knowledge that the number of individuals capable of significant achievement in such fields of endeavor is limited to those having the requisite intellectual capacity, academic achievement, and motivation, and that at any period in history this number is quite limited. Common sense suggests that, other factors being equal, such individuals will prefer to work at an institution of the first class. The only reasonable inference to be drawn from the donor's direction that the institution be devoted to the advancement of literature, science and art is that he intended that the institution be one of the first class. This conclusion is strengthened by the circumstance that the endowment fund provided was sufficient to make the project feasible, and that the original Trustees, parties to the trust instruments, so construed it.

While a reasonable construction of the trust instruments requires the conclusion that the donor intended to benefit the white inhabitants of the City of Houston and State of Texas primarily, reason compels the further conclusion that the instruction, benefits, and enjoyments of the Institute were not intended to benefit them solely. Expanded knowledge in the field of science

in the nature of things cannot be excluded from a segment of our society. The selection of a university as the most suitable instrument through which the purpose of the donor could be accomplished was the action of the Trustees, not the donor. It was not required by the terms of the trust, which might have been complied with literally by establishing a foundation to assist scholars, scientists, artists and writers financially; by establishing museums, and art galleries; and by establishing a polytechnical school. We cannot say that the donor had a fixed purpose to establish a university to which students would be admitted free, and from which Negroes would be excluded. It is equally clear, however, that the establishment of such an institution was within the discretionary power of the Trustees.

Nevertheless, to consider the instrument in light of the conditions prevailing at the time was executed, the fact of segregation of the races cannot be ignored. In 1891 in the State of Texas the segregation of races in public educational institutions was required by law, and such segregation was the invariable custom in private institutions. As a practical matter at that time a school was either a school for white children or one for Negro children. Bearing in mind the expressed intent to instruct the white inhabitants of Texas, the Trustees, when they established an educational institution to which students were to be admitted, understood that Negro students were to be excluded without specific instructions to that effect.

It also follows that, while the injunction that the instruction, benefits, and enjoyment derived from the Institute were to be free and open to all was not a specific instruction that no tuition be required of students of Rice University, it was the expression of a general philanthropic intent which the Trustees properly carried into effect by adopting a policy of requiring no tuition. Since these policies were adopted by the Trustees as their interpretation of the intention of the donor, and since these policies have been consistently followed for fifty

years without a question being raised as to their propriety, this Court would not be justified in adopting a construction of the instrument different from that of the Trustees designated by the donor to carry out his purposes unless compelled by the clear language of the trust instrument.

■ While we have concluded as a matter of law from the language of the trust instruments that the primary purpose of the donor was to establish an educational institution of the first class, the careful trial judge submitted the question to the jury, which found as a fact that such was his primary purpose. Complaint is made that the Court erred in the submission of this issue. Evidence was admitted which supports the jury's answer, and, in view of our construction of the instrument, the submission of such an issue could not have resulted in the entry of an improper judgment. Rule 434, Texas Rules of Civil Procedure.

In answer to special issues submitted to them, the jury found that William Marsh Rice intended that the funds given the Institute be used for the instruction and improvement of white inhabitants only, but that it is impossible or impracticable under present conditions to carry out said intent.

The jury also found that William Marsh Rice intended that the benefits to be derived from the Institute were to be free of tuition, but that it is impossible or impracticable under present conditions to carry out said intent.

There is no contention that the answers made by the jury to these issues are not supported by the evidence produced at the trial. Appellants complain that much of the evidence supporting these issues was erroneously admitted; that the issues submitted questions of law to the jury; and that the trial court erred in entering judgment based on the answers to these issues in that the court erroneously applied the doctrine of cy pres since the judgment defeated the intention of the donor instead of carrying it out as nearly as possible.

■ The appellants' objections to the use of the stipulations of fact were confined to relevancy and materiality, and essentially are based on the premise that the intention of the donor must be determined from the language of the trust instruments where there is no ambiguity. Even in such cases it is well settled that evidence tending to show the circumstances existing at the time of the execution of an instrument is relevant and material. Cutrer v. Cutrer, supra. It is also well settled that, even though a written contract is unambiguous, parol evidence is admissible for the purpose of applying the contract to the subject with which it deals. Murphy v. Dilworth, 137 Tex. 32, 151 S.W.2d 1004; Guardian Trust Co. v. Bauereisen, 132 Tex. 396, 121 S.W.2d 579; Scott v. Walden, 1942, 140 Tex. 31, 165 S.W.2d 449, 154 A.L.R. 1; Ellisor v. Kennedy, Tex.Civ.App., 128 S.W.2d 842, writ ref.

Professor Wigmore, in his Treatise on Evidence Law, points out that the interpretation of every written instrument requires some reference to extrinsic matters:

"The truth had finally to be recognized that words *always* need interpretation; that the process of interpretation inherently and invariably means the ascertainment of the association between words and external objects; and that this makes inevitable a free resort to extrinsic matters for applying and enforcing the document. * * * Once freed from the primitive formalism which views the document as a self-contained and self-operative formula, we can fully appreciate the modern principle that the words of a document are never anything but indices to extrinsic things, and that therefore *all the circumstances must be considered which go to make clear the sense of the words,*—that is, their association with things." (9 Wigmore, Evidence, Section 2470, p. 227.)

While the basic purpose of the trust can be determined from the language of the instruments together with the circumstances

existing at the time of their execution, there is necessity for parol evidence, in determining how the purposes expressed are to be put into effect, and in seeking to ascertain the relative importance attached to the various provisions by the donor. Parol evidence was clearly admissible and necessary on the issues relating to the applicability of the doctrine of approximation and deviation. The evidence which was admitted was not such as was calculated to add to or vary the terms of the trust instruments, but rather was evidence tending to explain, and make more definite the terms of the instrument, as well as to demonstrate that the actions of the Trustees actually carried out the intentions of the donor expressed in the trust instruments.

That the practical interpretation placed on the instrument by the Trustees, and the traditions established by them during the period of more than fifty years the institution has been in operation, are admissible, is supported both by reason and authority. Not only is it shown by evidence that the original trustees had discussed the trust with the donor, but it is reasonable to assume that the donor did discuss with them his intents and purposes in establishing the trust and that the actions of these trustees would reflect the understanding thus acquired. Scott, Trusts, § 164.1, p. 1160; 90 C.J.S. Trusts § 165c., p. 38; Wooster Rubber Co. v. C. I. R. (C.A. 6), 189 F.2d 878; Commercial National Bank & Trust Co. of New York v. Erwin, 277 App.Div. 378, 100 N.Y.S.2d 200; Henshaw v. Texas Natural Resources Foundation, 1949, 147 Tex. 436, 216 S.W.2d 566; William Buchanan Foundation v. Shepperd, supra.

■ In any event, it must be borne in mind that none of this evidence showing what the Trustees have done, or what they proposed to do, in carrying out the duties imposed on them by the terms of the trust, in any manner tended to contradict or vary the terms of the instruments. The evidence was admissible to show how they had exercised, or proposed to exercise, their discretionary powers. While the discretionary powers of the Trustees are not unlimited, the provisions of the trust instrument clearly vest in them wide powers in determining the method and procedure to be used in effectuating the purposes of the donor. In such case evidence is needed to show what has been done, and what is proposed, by the Trustees in order to determine whether they have exercised their discretion honestly and faithfully and in subservience to the main purpose disclosed by the trust instruments. This Court cannot substitute its discretion for that of the Trustees, and can interfere with their exercise of discretionary powers only in case of fraud, misconduct, or clear abuse of discretion. Nations v. Ulmer, Tex. Civ.App.1938, 122 S.W.2d 700, error dism.; 90 C.J.S. Trusts § 261, p. 308 et seq.

■ Other evidence, consisting of letters and documents from the Rice University Archives, was objected to on the ground that it was hearsay. While these documents are technically hearsay, they were admissible under recognized exceptions to the hearsay rule. King v. City of Dallas, Tex. Civ.App.1964, 374 S.W.2d 707, error ref., n. r. e.; Seaway Company v. Attorney General, Tex.Civ.App.1964, 375 S.W.2d 923, error ref., n. r. e.; Soohan v. The City of Philadelphia, 33 Pa. 9 (1859); A. L. I., Restatement of the Law of Trusts, 2d, § 382.

■ The testimony of Mr. George R. Brown was also properly admitted under the exception to the hearsay rule permitting testimony based on knowledge acquired in the line of official employment as well as that based on declarations made by a member of a family concerning matters of family history. 31A C.J.S. Evidence § 200, p. 571; Wolf v. Wilhelm, 146 S.W. 216 (Tex.Civ.App.1912, error ref.); McCormick and Ray, Evidence, § 1347, p. 193.

■ Neither was the testimony of Dr. Carey Croneis, Chancellor of Rice University, regarding the probable effects that the color and tuition restrictions would have on the future of Rice University, in-

admissible on the ground that it constituted hearsay. Dr. Croneis qualified as an expert on educational matters. The testimony complained of was given as a matter of opinion. The fact that the opinion of an expert is based on observations, conversations with others, reading and experience does not render it inadmissible. City of Houston v. Huber, 311 S.W.2d 488 (Tex.Civ.App.1958); City of Houston v. Collins, 310 S.W.2d 697 (Tex.Civ.App.1958).

The evidence in this case, and the facts found by the jury, fully support the action of the trial court in exercising his equitable power to authorize a deviation from the terms of the trust established by William Marsh Rice. Professor Scott, in his treatise on Trusts, states:

" * * * The courts will direct or permit a deviation from the terms of the trust where compliance is impossible or illegal, or where owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust. * * *

"There is greater occasion for the exercise of the power of the court to permit or direct a deviation from the terms of the trust in the case of charitable trusts than in the case of private trusts, since charitable trusts may continue for an indefinite period and changes in conditions not foreseen by the settlor are therefore more likely to occur. Moreover, in the case of charitable trusts the court has the power not merely, as in the case of private trusts, to permit deviations as to matters relating to the administration of the trust, but also as to the purposes of the trust. This power of the court, under the so-called doctrine of cy pres, goes quite beyond anything which is permitted in the case of private trusts. * * * " (Scott on Trusts, Vol. IV, § 381, pp. 2738–2741.)

With reference to the exercise of the cy pres power, the same author states:

"Where property is given in trust for a particular charitable purpose, and it is impossible or impracticable to carry out that purpose, the trust does not fail if the testator has a more general intention to devote the property to charitable purposes. In such a case the property will be applied under the direction of the court to some charitable purpose falling within the general intention of the testator. * * * (Scott on Trusts, supra, § 399.2, p. 2831.)

"Where a main charitable purpose is disclosed with reasonable clearness, directions of the donor as to management of the trust and the precise manner of its application may be regarded as directory rather than mandatory, if necessary to carry out its leading purpose. It will be presumed that the details were meant to be subject to unforeseen and unforeseeable circumstances which might render them impracticable or illegal. In such case, administrative duties may be varied, details changed, and the main purpose carried out cy pres, or as nearly as possible according to the plan prescribed by the trust instrument. * * * " (15 Am.Jur.2d Charities, § 135, p. 143.)

In Bogert, Trusts and Trustees, 2d Ed., § 561, p. 128 et seq., the author discusses the authority of the courts to permit deviations from the terms of private trusts:

"But it occasionally develops in the course of the administration of a trust that adherence to the provisions regarding means, methods, and details will either render it impossible or extremely difficult for the trustee to execute the clauses of the trust having to do with the financial benefits intended to be received by the cestuis, and the court is faced with the alternative of abiding by the settlor's directions in all respects or giving preference to one clause over another. * * *

"In this dilemma the courts take a position which seems very reasonable and justifiable. They take the view that where there is a conflict between a disposition provision and an administrative direction the latter should give way. The primary and fundamental objects of the trustor are to make certain property transfers to the

cestui's and thus secure for them certain advantages \* \* \* The terms of the trust having to do with the manner in which the trustee should act in order to obtain the primary objectives are not on the same level of importance but are rather minor and auxiliary. The jurisdiction of equity to enforce trusts should and does include power to vary the details of administration which the settlor has prescribed in order to secure the more important result, namely, obtaining for the beneficiaries the advantages which the settlor stated he wished them to have. \* \* \*

"In discussing the rationale of the power of the court to permit deviation some courts assert that they are carrying out the implied intent of the settlor, or are merely doing what the settlor himself would have done if he now had the power to change his trust.

"But it is believed that a more satisfactory explanation of the existence of the power in the court is that the jurisdiction of the court to enforce trusts means to procure the carrying out of the primary objectives which the settlor stated, and that this process includes modifying or negating clauses which have to do only with ways and means and which obstruct or frustrate."

These principles have been recognized and applied by the courts of Texas. Inglish v. Johnson, 1906, 42 Tex.Civ.App. 118, 95 S.W. 558, error ref.; Cushing v. Fort Worth National Bank, Tex.Civ.App.1955, 284 S.W.2d 791, ref., n. r. e.; Scott v. Sterrett, Tex.Civ.App.1950, 234 S.W.2d 917, error ref., n. r. e. See dissenting opinion of Norvell, J., in San Antonio Ind. School Dist. v. Division of World Missions, 1961, 161 Tex. 471, 341 S.W.2d 896.

Testimony was produced at the trial of this case from the Chancellors and Presidents of most of the universities located in the State of Texas. This testimony, with no material inconsistency or contradiction, established that under present conditions no university that discriminates in the selection of teachers or students on the basis of race

could attain or retain the status of a university of the first class because it could not recruit the necessary faculty, and would be at a disadvantage in seeking grants for research from foundations and the government. It was established that it would be impossible to carry on significant research in the field of science without such assistance since the cost of necessary facilities and equipment is prohibitive. It was established that Rice University has attained a position of eminence in selected scientific fields, but has not reached this position in the humanities and literature.

It was also established that the costs of operating a university increased slowly before the Second World War and have increased astronomically since that time. There was testimony that a professor drawing a salary of $7,500.00 at the University of Texas in 1946 would be paid $20,000.00 today; that the costs of equipment required in a professional engineering school have increased not only because of the general increase in prices, but also because new kinds of equipment have been devised. To maintain a library, books that cost $2.50 have to be replaced at $7.50. The number and variety of scientific and professional books and journals necessary for a graduate school have increased greatly. The cost of operating a graduate program is much greater per student than that of the undergraduate program, and Rice University could not possibly maintain its position if it curtailed its graduate program. There was testimony that the greatest educational need in Texas today is for an increase in the facilities for, and quality of, the graduate programs offered. There was testimony that in order to become a university of the the first class, Rice University needs to expand its graduate programs in the humanities and liberal arts. There was testimony that Rice was unable to fill teaching positions authorized in 1963 costing $177,965.00 because of budgetary limitations. The evidence shows that the cost per student at Rice University has increased from $286.00 in 1940 to $2,737.00 in 1964. There was

testimony that in the fiscal year ending June 30, 1963, Rice sustained a deficit of $150,000.00, and that for the year 1964 a deficit of $560,367.00 was anticipated. While it was shown that there was no deficit in 1963 considering cash flow because a sum in excess of the deficit was allocated to a contingency fund, this was not true with regard to the anticipated future deficits. There was testimony that the failure of Rice University to charge tuition impaired its ability to secure foundation grants. There was testimony that if the institution continued to operate on a deficit basis it could not maintain its program and position in the academic world, and that it would be impossible for a poor university to stay great. There was direct testimony that the typical tuition charged a graduate student thirty years ago was $400.00, but that this tuition today approximates $2,000.00, and that Rice University will be severely handicapped in its effort even to maintain its position of preeminence in the field of technology and science if it does not charge tuition.

While it is well known that Rice University is one of the most richly endowed schools in the South, it is a matter of common knowledge that for some years costs have been increasing faster than the rate of return on invested capital. If Rice University is denied all sources of revenue other than gifts and income from the endowment fund, it is entirely reasonable to conclude that it will inevitably, in the course of time, fall behind those schools receiving large percentages of their operating revenue from tuition or tax sources. The remarkable achievements in science, which have occurred since the death of William Marsh Rice and which make necessary the use of extremely expensive atomic and electronic equipment by educational institutions engaged in scientific research necessary in order to maintain a competitive position in the educational world, could not have been foreseen, and were not foreseen by him. There was a question of fact as to whether it is impossible or impractical to carry out the purpose of William Marsh Rice that the benefits to be derived from the Institute be free of tuition. The jury's determination of this issue of fact is conclusive on this Court since it is supported by evidence.

The judgment entered by the trial court is supported by our construction of the trust instruments, the evidence, the facts found by the jury, and the applicable rules of law. It is, therefore, affirmed.